SINCLAIR REFINING CO. *v.* ATKINSON ET AL.

No. 434. Argued April 18, 1962.—Decided June 18, 1962.

196

*George B. Christensen* argued the cause for petitioner. With him on the briefs were *Fred H. Daugherty* and *Richard W. Austin.*

*Gilbert A. Cornfield* argued the cause for respondents. With him on the briefs were *Gilbert Feldman* and *William E. Rentfro.*

MR. JUSTICE BLACK delivered the opinion of the Court.

The question this case presents is whether § 301 of the Taft-Hartley Act, in giving federal courts jurisdiction of suits between employers and unions for breach of collective bargaining agreements,[1] impliedly repealed § 4 of the pre-existing Norris-LaGuardia Act, which, with certain exceptions not here material, barred federal courts from issuing injunctions "in any case involving or growing out of any labor dispute."[2]

---

[1] "Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties." 61 Stat. 156, 29 U. S. C. § 185 (a).

[2] "No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute (as these terms are herein defined) from doing, whether singly or in concert, any of the following acts:

"(a) Ceasing or refusing to perform any work or to remain in any relation of employment;

. . . . .

"(e) Giving publicity to the existence of, or the facts involved in, any labor dispute, whether by advertising, speaking, patrolling, or by any other method not involving fraud or violence;

. . . . .

"(i) Advising, urging, or otherwise causing or inducing without fraud or violence the acts heretofore specified . . . ." 47 Stat. 70, 29 U. S. C. § 104.

The complaint here was filed by the petitioner Sinclair Refining Company against the Oil, Chemical and Atomic Workers International Union and Local 7–210 of that union and alleged: that the International Union, acting by and with the authority of the Local Union and its members, signed a written collective bargaining contract with Sinclair which provided for compulsory, final and binding arbitration of "any difference regarding wages, hours or working conditions between the parties hereto or between the Employer and an employee covered by this working agreement which might arise within any plant or within any region of operations"; that this contract also included express provisions by which the unions agreed that "there shall be no slowdowns for any reason whatsoever" and "no strikes or work stoppages . . . [f]or any cause which is or may be the subject of a grievance"; and that notwithstanding these promises in the collective bargaining contract the members of Local 7–210 had, over a period of some 19 months, engaged in work stoppages and strikes on nine separate occasions, each of which, the complaint charged, grew out of a grievance which could have been submitted to arbitration under the contract and therefore fell squarely within the unions' promises not to strike. This pattern of repeated, deliberate violations of the contract, Sinclair alleged, indicated a complete disregard on the part of the unions for their obligations under the contract and a probability that they would continue to "subvert the provisions of the contract" forbidding strikes over grievances in the future unless they were enjoined from doing so. In this situation, Sinclair claimed, there was no adequate remedy at law which would protect its contractual rights and the court should therefore enter orders enjoining the unions and their agents "preliminarily at first, and thereafter permanently, from aiding, abetting, fomenting, advising, participating in, ratifying, or condoning any strike, stoppage of work,

slowdown or any other disruption of, or interference with normal employment or normal operation or production by any employee within the bargaining unit at plaintiff's East Chicago, Indiana refinery covered by the contract between the parties dated August 8, 1957, in support of, or because of, any matter or thing which is, or could be, the subject of a grievance under the grievance procedure of the said contract, or any extension thereof, or any other contract between the parties which shall contain like or similar provisions." [3]

The unions moved to dismiss this complaint on the ground that it sought injunctive relief which United States courts, by virtue of the Norris-LaGuardia Act, have no jurisdiction to give. The District Court first denied the motion, but subsequently, upon reconsideration after full oral argument, vacated its original order and granted the unions' motion to dismiss. [4] In reaching this conclusion, the District Court reasoned that the controversy between Sinclair and the unions was unquestionably a "labor dispute" within the meaning of the Norris-LaGuardia Act and that the complaint therefore came within the proscription of § 4 of that Act which "withdraws jurisdiction from the federal courts to issue injunctions to prohibit the refusal 'to perform work or remain in any relation of employment' in cases involving *any* labor dispute." [5] The Court of Appeals for the Seventh Circuit affirmed the order of dismissal for the same reasons. [6] Because this decision presented a conflict with the deci-

---

[3] The suit filed by Sinclair was in three counts, only one of which, Count 3, is involved in this case. Counts 1 and 2, upon which Sinclair prevailed below, are also before the Court in No. 430. See *Atkinson* v. *Sinclair Refining Co.*, *post*, p. 238, decided today.

[4] 187 F. Supp. 225.

[5] *Id.*, at 228.

[6] 290 F. 2d 312.

sion on this same important question by the Court of Appeals for the Tenth Circuit,[7] we granted certiorari.[8]

We agree with the courts below that this case does involve a "labor dispute" within the meaning of the Norris-LaGuardia Act. Section 13 of that Act expressly defines a labor dispute as including "any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee." [9] Sinclair's own complaint shows quite plainly that each of the alleged nine work stoppages and strikes arose out of a controversy which was unquestionably well within this definition.[10]

---

[7] *Chauffeurs, Teamsters & Helpers Local No. 795* v. *Yellow Transit Freight Lines,* 282 F. 2d 345. Both the First and the Second Circuits have also considered this question and both have taken the same position as that taken below. See *W. L. Mead, Inc.,* v. *Teamsters Local No. 25,* 217 F. 2d 6; *Alcoa S. S. Co.* v. *McMahon,* 173 F. 2d 567; *In re Third Ave. Transit Corp.,* 192 F. 2d 971; *A. H. Bull Steamship Co.* v. *Seafarers' International Union,* 250 F. 2d 326.

[8] 368 U. S. 937.

[9] 47 Stat. 73, 29 U. S. C. § 113.

[10] The allegations of the complaint with regard to the nine occurrences in question are as follows:

"(a) On or about July 1, 1957, six employees assigned to the #810 Crude Still stopped work in support of an asserted grievance involving the removal of Shift Machinists from the #810 Still area;

"(b) On or about September 17, 1957, all employees employed in the Mason Department refused to work on any shift during the entire day; the entire Mechanical Department refused to work from approximately noon until midnight; the employees of the Barrel House refused to work from the middle of the afternoon until midnight; a picket line was created which prevented operators from reporting to work on the 4:00 P. M. to midnight shift, all in support of an asserted grievance on behalf of five apprentice masons for whom

Nor does the circumstance that the alleged work stoppages and strikes may have constituted a breach of a collective bargaining agreement alter the plain fact that a "labor dispute" within the meaning of the Norris-LaGuardia Act is involved. Arguments to the contrary proceed from the premise that § 2 of that Act, which

---

insufficient work was available to permit their retention at craft levels.

"(c) On or about March 28, 1958, approximately 73 employees in the Rigging Department refused to work for approximately one hour in support of an asserted grievance that riggers were entitled to do certain work along with machinists.

"(d) On or about May 20, 1958, approximately 24 employees in the Rigging Department refused to work for 1¾ hours in support of an asserted grievance that riggers were entitled to do certain work along with boilermakers.

"(e) On or about September 11, 1958, approximately 24 employees in the Rigging Department refused to work for approximately two hours in support of an asserted grievance that pipefitters could not dismantle and remove certain pipe coils without riggers being employed on the said work also.

"(f) On or about October 6 and 7, 1958, approximately 43 employees in the Cranes and Trucks Department refused to work for approximately eight hours in support of an asserted grievance concerning employment by the Company of an independent contractor to operate a contractor owned crane.

"(g) On or about November 19, 1958, approximately 71 employees refused to work for approximately 3¾ hours in the Boilermaking Department in support of an asserted grievance that burners and riggers would not dismantle a tank roof without employment of boilermakers at the said task.

"(h) On or about November 21, 1958, in further pursuance of the asserted grievance referred to in subparagraph (g) preceding, the main entrance to the plant was picketed and barricaded, thereby preventing approximately 800 employees from reporting for work for an entire shift.

"(i) On or about February 13 and 14, 1959, approximately 999 employees were induced to stop work over an asserted grievance on behalf of three riggers that they should not have been docked an aggregate of $2.19 in their pay for having reported late to work."

expresses the public policy upon which the specific anti-injunction provisions of the Act were based, contains language indicating that one primary concern of Congress was to insure workers the right "to exercise actual liberty of contract" and to protect "concerted activities for the purpose of collective bargaining." [11] From that premise, Sinclair argues that an interpretation of the term "labor dispute" so as to include a dispute arising out of a union's refusal to abide by the terms of a collective agreement to which it freely acceded is to apply the Norris-LaGuardia Act in a way that defeats one of the purposes for which it was enacted. But this argument, though forcefully urged both here and in much current commentary on this question,[12] rests more upon considerations of what many

---

[11] "In the interpretation of this Act and in determining the jurisdiction and authority of the courts of the United States, as such jurisdiction and authority are herein defined and limited, the public policy of the United States is hereby declared as follows:

"Whereas under prevailing economic conditions, developed with the aid of governmental authority for owners of property to organize in the corporate and other forms of ownership association, the individual unorganized worker is commonly helpless to exercise actual liberty of contract and to protect his freedom of labor, and thereby to obtain acceptable terms and conditions of employment, wherefore, though he should be free to decline to associate with his fellows, it is necessary that he have full freedom of association, self-organization, and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment, and that he shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection; therefore, the following definitions of, and limitations upon, the jurisdiction and authority of the courts of the United States are enacted." 47 Stat. 70, 29 U. S. C. § 102.

[12] One of the most forthright arguments for judicial re-evaluation of the wisdom of the anti-injunction provisions of the Norris-LaGuardia Act and judicial rather than congressional revision of the meaning and scope of these provisions as applied to conduct in breach of a collec-

202

commentators think would be the more desirable industrial and labor policy in view of their understanding as to the prevailing circumstances of contemporary labor-management relations than upon what is a correct judicial interpretation of the language of the Act as it was written by Congress.

In the first place, even the general policy declarations of § 2 of the Norris-LaGuardia Act, which are the foundation of this whole argument, do not support the conclusion urged. That section does not purport to limit the Act to the protection of collective bargaining but, instead, expressly recognizes the need of the anti-injunction provisions to insure the right of workers to engage in "concerted activities for the purpose of collective bargaining *or other mutual aid or protection.*" Moreover, the language of the specific provisions of the Act is so broad and inclusive that it leaves not the slightest opening for reading in any exceptions beyond those clearly written into it by Congress itself.[13]

tive bargaining agreement is presented in Gregory, The Law of the Collective Agreement, 57 Mich. L. Rev. 635. That author, in urging that a strike in breach of a collective agreement should not now be held to involve or grow out of a "labor dispute" within the meaning of the Norris-LaGuardia Act, states: "After all, 1932 was a long time ago and conditions have changed drastically. Judges who still confuse violations of collective agreements with § 13 labor disputes and § 4 conduct have, in my opinion, lost contact with reality. The passage of time has operated as a function of many other types of judicial output at the highest level. I do not see why it should not do so in this instance, as well." *Id.,* at 645–646, n. 39. See also Stewart, No-Strike Clauses in the Federal Courts, 59 Mich. L. Rev. 673, especially at 683; Rice, A Paradox of our National Labor Law, 34 Marq. L. Rev. 233.

[13] Thus we conclude here precisely as we did in *Lauf* v. *E. G. Shinner & Co.,* 303 U. S. 323, 330: "We find nothing in the declarations of policy which narrows the definition of a labor dispute as found in the statutes. The rights of the parties and the jurisdiction of the federal courts are to be determined according to the express provisions applicable to labor disputes as so defined."

We cannot ignore the plain import of a congressional enactment, particularly one which, as we have repeatedly said, was deliberately drafted in the broadest of terms in order to avoid the danger that it would be narrowed by judicial construction.[14]

Since we hold that the present case does grow out of a "labor dispute," the injunction sought here runs squarely counter to the proscription of injunctions against strikes contained in § 4 (a) of the Norris-LaGuardia Act, to the proscription of injunctions against peaceful picketing contained in § 4 (e) and to the proscription of injunctions prohibiting the advising of such activities contained in § 4 (i).[15] For these reasons, the Norris-LaGuardia Act deprives the courts of the United States of jurisdiction to enter that injunction unless, as is contended here, the scope of that Act has been so narrowed by the subsequent enactment of § 301 of the Taft-Hartley Act that it no longer prohibits even the injunctions specifically described in § 4 where such injunctions are sought as a remedy for breach of a collective bargaining agreement. Upon consideration, we cannot agree with that view and agree instead with the view expressed by the courts below and supported by the Courts of Appeals for the First and Second Circuits that § 301 was not intended to have any such partially repealing effect upon such a long-standing, carefully thought out and highly significant part of this country's labor legislation as the Norris-LaGuardia Act.[16]

---

[14] *United States* v. *Hutcheson*, 312 U. S. 219, 234, and cases cited therein.

[15] See note 2, *supra*.

[16] We need not here again go into the history of the Norris-LaGuardia Act nor the abuses which brought it into being for that has been amply discussed on several occasions. See Frankfurter and Greene, The Labor Injunction. And see *e. g., United States* v. *Hutcheson*, 312 U. S. 219, 235–236; *Milk Wagon Drivers' Union* v. *Lake Valley Farm Products, Inc.*, 311 U. S. 91, 102–103. It is

The language of § 301 itself seems to us almost if not entirely conclusive of this question. It is especially significant that the section contains no language that could by any stretch of the imagination be interpreted to constitute an explicit repeal of the anti-injunction provisions of the Norris-LaGuardia Act in view of the fact that the section does expressly repeal another provision of the Norris-LaGuardia Act dealing with union responsibility for the acts of agents.[17] If Congress had intended that § 301 suits should also not be subject to the anti-injunction provisions of the Norris-LaGuardia Act, it certainly seems likely that it would have made its intent known in this same express manner. That is indeed precisely what Congress did do in § 101, amending § 10 (h) of the National Labor Relations Act, and § 208 (b) of the Taft-Hartley Act, by permitting injunctions to be obtained, not by private litigants, but only at the instance of the National Labor Relations Board and the Attorney Gen-

sufficient here to note that the reasons which led to the passage of the Act were substantial and that the Act has been an important part of the pattern of legislation under which unions have functioned for nearly 30 years.

[17] Section 301 (e) of the Act, 61 Stat. 156, 29 U. S. C. § 185 (e), provides: "For the purposes of this section, in determining whether any person is acting as an 'agent' of another person so as to make such other person responsible for his acts, the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling." This, of course, was designed to and did repeal for purposes of suits under § 301 the previously controlling provisions of § 6 of the Norris-LaGuardia Act, 47 Stat. 71, 29 U. S. C. § 106: "No officer or member of any association or organization, and no association or organization participating or interested in a labor dispute, shall be held responsible or liable in any court of the United States for the unlawful acts of individual officers, members, or agents, except upon clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof."

eral,[18] and in § 302 (e), by permitting private litigants to obtain injunctions in order to protect the integrity of employees' collective bargaining representatives in carrying out their responsibilities.[19] Thus the failure of Congress to include a provision in § 301 expressly repealing the anti-injunction provisions of the Norris-LaGuardia Act must be evaluated in the context of a statutory pattern that indicates not only that Congress was completely familiar with those provisions but also that it regarded an express declaration of inapplicability as the normal and proper manner of repealing them in situations where such repeal seemed desirable.

When the inquiry is carried beyond the language of § 301 into its legislative history, whatever small doubts as to the congressional purpose could have survived consideration of the bare language of the section should be wholly dissipated. For the legislative history of § 301 shows that Congress actually considered the advisability of repealing the Norris-LaGuardia Act insofar as suits based upon breach of collective bargaining agreements are concerned and deliberately chose not to do so.[20] The

---

[18] 61 Stat. 146, 155, as amended, 29 U. S. C. §§ 160 (h), 178 (b).

[19] 61 Stat. 157, 29 U. S. C. § 186 (e). That this section, which stands alone in expressly permitting suits for injunctions previously proscribed by the Norris-LaGuardia Act to be brought in the federal courts by private litigants under the Taft-Hartley Act, deals with an unusually sensitive and important problem is shown by the fact that § 186 makes the conduct so enjoinable a crime punishable by both fine and imprisonment.

[20] This fact was expressly recognized by the Court of Appeals for the Second Circuit in *A. H. Bull Steamship Co.* v. *Seafarers' International Union,* 250 F. 2d 326, 331–332. See also *W. L. Mead, Inc.,* v. *Teamsters Local No. 25,* 217 F. 2d 6, 9–10; Comment, Labor Injunctions and Judge-Made Labor Law: The Contemporary Role of Norris-LaGuardia, 70 Yale L. J. 70, 97–99. Another commentator, though urging his own belief that a strike in breach of a collective agreement is not a "labor dispute" within the Norris-LaGuardia Act, nevertheless admits that Congress thought it was and deliberately

section as eventually enacted was the product of a conference between Committees of the House and Senate, selected to resolve the differences between conflicting provisions of the respective bills each had passed. Prior to this conference, the House bill had provided for federal jurisdiction of suits for breach of collective bargaining contracts and had expressly declared that the Norris-LaGuardia Act's anti-injunction provisions would not apply to such suits.[21] The bill passed by the Senate, like the House bill, granted federal courts jurisdiction over suits for breach of such agreements but it did not, like the House bill, make the Norris-LaGuardia Act's prohibition against injunctions inapplicable to such suits.[22] Instead it made breach of a collective agreement an unfair labor practice.[23] Under the Senate version, therefore, a breach

---

decided to leave the anti-injunction provisions of that Act applicable to § 301 suits. See Rice, A Paradox of our National Labor Law, 34 Marq. L. Rev. 233, 235.

[21] H. R. 3020, 80th Cong., 1st Sess., as it passed the House, provided:

"Sec. 302. (a) Any action for or proceeding involving a violation of an agreement between an employer and a labor organization or other representative of employees may be brought by either party in any district court of the United States having jurisdiction of the parties, without regard to the amount in controversy, if such agreement affects commerce, or the court otherwise has jurisdiction of the cause.

. . . . .

"(e) In actions and proceedings involving violations of agreements between an employer and a labor organization or other representative of employees, the provisions of the Act of March 23, 1932, entitled 'An Act to amend the Judicial Code and to define and limit the jurisdiction of courts sitting in equity and for other purposes,' shall not have any application in respect of either party." I Legislative History of the Labor Management Relations Act, 1947, 221–222.

[22] This is true both of the original Senate bill, S. 1126, as reported and of the amended House bill, H. R. 3020, as passed by the Senate. I Leg. Hist. 151–152; I Leg. Hist. 279–280.

[23] I Leg. Hist. 111–112, 114, 239, 241–242.

of a collective bargaining agreement, like any unfair labor practice, could have been enjoined by a suit brought by the National Labor Relations Board,[24] but no provision of the Senate version would have permitted the issuance of an injunction in a labor dispute at the suit of a private party. At the conference the provision of the House bill expressly repealing the anti-injunction provisions of the Norris-LaGuardia Act, as well as the provision of the bill passed by the Senate declaring the breach of a collective agreement to be an unfair labor practice, was dropped and never became law. Instead, the conferees, as indicated by the provision which came out of the conference and eventually became § 301, agreed that suits for breach of such agreements should remain wholly private and "be left to the usual processes of the law" [25] and that, in view of the fact that these suits would be at the instance of private parties rather than at the instance of the Labor Board, no change in the existing anti-injunction provisions of the Norris-LaGuardia Act should be made. The House Conference Report expressly recognized that the House provision for repeal in contract actions of the anti-injunction prohibitions of the Norris-LaGuardia Act had been eliminated in Conference:

> "Section 302 (e) of the House bill made the Norris-LaGuardia Act inapplicable in actions and proceedings involving violations of agreements between an employer and a labor organization. Only part of this provision is included in the conference agreement. Section 6 of the Norris-LaGuardia Act provides that no employer or labor organization

---

[24] In such a situation, suit for injunction could be brought by the Board and, by virtue of § 10 (h) of the National Labor Relations Act, as amended by the Taft-Hartley Act, 61 Stat. 146, 29 U. S. C. § 160 (h), the Norris-LaGuardia Act would not apply.

[25] H. R. Conf. Rep. No. 510, on H. R. 3020, 80th Cong., 1st Sess., pp. 41–42, I Leg. Hist. 545–546.

participating or interested in a labor dispute shall be held responsible for the unlawful acts of their agents except upon clear proof of actual authorization of such acts, or ratification of such acts after actual knowledge thereof. This provision in the Norris-LaGuardia Act was made inapplicable under the House bill. Section 301 (e) of the conference agreement provides that for the purposes of section 301 in determining whether any person is acting as an agent of another so as to make such other person responsible for his actions, the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling." [26]

And Senator Taft, Chairman of the Conference Committee and one of the authors of this legislation that bore his name, was no less explicit in explaining the results of the Conference to the Senate: "The conferees . . . rejected the repeal of the Norris-LaGuardia Act." [27]

---

[26] H. R. Conf. Rep. No. 510, on H. R. 3020, 80th Cong., 1st Sess., p. 66, I Leg. Hist. 570.

[27] 93 Cong. Rec. 6445–6446, II Leg. Hist. 1544. Immediately prior to this remark, Senator Taft had inserted into the Record a written summary of his understanding as to the effect of the conference upon the bill passed by the Senate: "When the bill passed the Senate it also contained a sixth paragraph in this subsection [8 (a)] which made it an unfair labor practice for an employer to violate the terms of a collective-bargaining agreement or the terms of an agreement to submit a labor dispute to arbitration. The House conferees objected to this provision on the ground that it would have the effect of making the terms of every collective agreement subject to interpretation and determination by the Board, rather than by the courts. The Senate conferees ultimately agreed to its elimination as well as the deletion of a similar provision contained in subsection 8 (b)(5) of the Senate amendment which made it an unfair labor practice for a labor organization to violate the terms of collective-bargaining agreements. The provisions of the Senate amendment *which conferred a right of action for damages* upon a party aggrieved by breach of a collective-

We cannot accept the startling argument made here that even though Congress did not itself want to repeal the Norris-LaGuardia Act, it was willing to confer a power upon the courts to "accommodate" that Act out of existence whenever they might find it expedient to do so in furtherance of some policy they had fashioned under § 301. The unequivocal statements in the House Conference Report and by Senator Taft on the floor of the Senate could only have been accepted by the Congressmen and Senators who read or heard them as assurances that they could vote in favor of § 301 without altering, reducing or impairing in any manner the anti-injunction provisions of the Norris-LaGuardia Act. This is particularly true of the statement of Senator Taft, a man generally regarded in the Senate as a very able lawyer and one upon whom the Senate could rely for accurate, forthright explanations of legislation with which he was connected. Senator Taft was of course entirely familiar with the prohibitions of the Norris-LaGuardia Act and the impact those prohibitions would have upon the enforcement under § 301 of all related contractual provisions, including contractual provisions dealing with arbitration. If, as this argument suggests, the intention of Congress in enacting § 301 was to clear the way for judicial obliteration of that Act under the soft euphemism of "accommodation," Senator Taft's flat statement that the Conference had rejected the repeal of the Norris-LaGuardia Act could only be regarded as disingenuous. We cannot impute any such intention to him.

Moreover, we think that the idea that § 301 sanctions piecemeal judicial repeal of the Norris-LaGuardia Act requires acceptance of a wholly unrealistic view of the manner in which Congress handles its business. The

---

bargaining contract, however, were retained in the conference agreement (section 301)." 93 Cong. Rec. 6443, II Leg. Hist. 1539. (Emphasis supplied.)

question of whether existing statutes should be continued in force or repealed is, under our system of government, one which is wholly within the domain of Congress. When the repeal of a highly significant law is urged upon that body and that repeal is rejected after careful consideration and discussion, the normal expectation is that courts will be faithful to their trust and abide by that decision. This is especially so where the fact of the controversy over repeal and the resolution of that controversy in Congress plainly appears in the formal legislative history of its proceedings.[28] Indeed, not a single instance has been called to our attention in which a carefully considered and rejected proposal for repeal has been revived and adopted by this Court under the guise of "accommodation" or any other pseudonym.

Nor have we found anything else in the previous decisions of this Court that would indicate that we should disregard all this overwhelming evidence of a congressional intent to retain completely intact the anti-injunction prohibitions of the Norris-LaGuardia Act in suits brought under § 301. *Brotherhood of Railroad Trainmen* v. *Chicago River & Indiana R. Co.*,[29] upon which Sinclair places

---

[28] The legislative history of the Taft-Hartley Act shows that Congress actually considered and relied upon this normal functioning of the judicial power as insuring that no unintended repeal of the anti-injunction provisions of the Norris-LaGuardia Act would be declared. Thus Senator Taft, when pressed by Senator Morse with regard to the possibility that a provision inserted in § 303 (a) declaring secondary boycotts unlawful might be held to justify an injunction previously forbidden by the Norris-LaGuardia Act, stated: "Let me say in reply to the Senator or anyone else who makes the same argument, that that is not the intention of the author of the amendment. It is not his belief as to the effect of it. It is not the advice of counsel to the committee. Under those circumstances, I do not believe that any court would construe the amendment along the lines suggested by the Senator from Oregon." 93 Cong. Rec. 4872, II Leg. Hist. 1396.

[29] 353 U. S. 30.

its primary reliance, is distinguishable on several grounds. There we were dealing with a strike called by the union in defiance of an affirmative duty, imposed upon the union by the Railway Labor Act itself, compelling unions to settle disputes as to the interpretation of an existing collective bargaining agreement, not by collective union pressures on the railroad but by submitting them to the Railroad Adjustment Board as the exclusive means of final determination of such "minor" disputes.[30] Here, on the other hand, we are dealing with a suit under a quite different law which does not itself compel a particular, exclusive method for settling disputes nor impose any requirement, either upon unions or employers, or upon the courts, that is in any way inconsistent with a continuation of the Norris-LaGuardia Act's proscription of federal labor injunctions against strikes and peaceful picketing. In addition, in *Chicago River* we were dealing with a statute that had a far different legislative history than the one now before us. Thus there was no indication in the legislative history of the Railway Labor Act, as there is in the history of § 301, that Congress had, after full debate and careful consideration by both Houses and in Joint Conference, specifically rejected proposals to make the prohibitions of the Norris-LaGuardia Act inapplicable. Indeed, the Court was able to conclude in *Chicago River* "that there was general understanding between both the supporters and the opponents of the 1934 amendment that the provisions dealing with the Adjustment Board were to be considered as compulsory arbitration in this limited field." [31] And certainly no one could

---

[30] The Court in *Chicago River* expressly recognized and rested its decision upon the differences between provisions for the settlement of disputes under the Railway Labor Act and the Taft-Hartley Act. *Id.,* at 31–32, n. 2. See also *Order of Railroad Telegraphers* v. *Chicago & North Western R. Co.,* 362 U. S. 330, 338–340.

[31] 353 U. S. 30, at 39.

contend that § 301 was intended to set up any such system of "compulsory arbitration" as the exclusive method for settling grievances under the Taft-Hartley Act.

*Textile Workers Union* v. *Lincoln Mills*,[32] upon which some lesser reliance is placed, is equally distinguishable. There the Court held merely that it did not violate the anti-injunction provisions of the Norris-LaGuardia Act to compel the parties to a collective bargaining agreement to submit a dispute which had arisen under that agreement to arbitration where the agreement itself required arbitration of the dispute. In upholding the jurisdiction of the federal courts to issue such an order against a challenge based upon the Norris-LaGuardia Act, the Court pointed out that the equitable relief granted in that case—a mandatory injunction to carry out an agreement to arbitrate—did not enjoin any one of the kinds of conduct which the specific prohibitions of the Norris-LaGuardia Act withdrew from the injunctive powers of United States courts.[33] An injunction against work stoppages, peaceful picketing or the nonfraudulent encouraging of those activities would, however, prohibit the precise kinds of conduct which subsections (a), (e) and (i) of § 4 of the Norris-LaGuardia Act unequivocally say cannot be prohibited.[34]

---

[32] 353 U. S. 448.

[33] *Id.*, at 458. See also *Order of Railroad Telegraphers* v. *Chicago & North Western R. Co.*, 362 U. S. 330, 338–339, where *Lincoln Mills* and other cases not involving an injunction against activity protected by § 4 of the Norris-LaGuardia Act were distinguished on this ground.

[34] An injunction against a strike or peaceful picketing in breach of a collective agreement "would require strong judicial creativity in the face of the plain meaning of Section 4," Cox, Current Problems in the Law of Grievance Arbitration, 30 Rocky Mt. L. Rev. 247, 256, for, indeed, such an injunction "would fly in the face of the plain words of Section 4 of the Norris-LaGuardia Act, the historical purpose of which was to make peaceful concerted activities unenjoinable without regard to the nature of the labor dispute." *Id.*, at 253.

Nor can we agree with the argument made in this Court that the decision in *Lincoln Mills,* as implemented by the subsequent decisions in *United Steelworkers* v. *American Manufacturing Co.,*[35] *United Steelworkers* v. *Warrior & Gulf Navigation Co.,*[36] and *United Steelworkers* v. *Enterprise Wheel & Car Corp.,*[37] requires us to reconsider and overrule the action of Congress in refusing to repeal or modify the controlling commands of the Norris-LaGuardia Act. To the extent that those cases relied upon the proposition that the arbitration process is "a kingpin of federal labor policy," we think that proposition was founded not upon the policy predilections of this Court but upon what Congress said and did when it enacted § 301. Certainly we cannot accept any suggestion which would undermine those cases by implying that the Court went beyond its proper power and itself "forged . . . a kingpin of federal labor policy" inconsistent with that section and its purpose. Consequently, we do not see how cases implementing the purpose of § 301 can be said to have freed this Court from its duty to give effect to the plainly expressed congressional purpose with regard to the continued application of the anti-injunction provisions of the Norris-LaGuardia Act. The argument to the contrary seems to rest upon the notion that injunctions against peaceful strikes are necessary to make the arbitration process effective. But whatever might be said about the merits of this argument, Congress has itself rejected it. In doing so, it set the limit to which it was willing to go in permitting courts to effectuate the congressional policy favoring arbitration and it is not this Court's business to review the wisdom of that decision.

The plain fact is that § 301, as passed by Congress, presents no conflict at all with the anti-injunction provisions of the Norris-LaGuardia Act. Obedience to the congres-

---

[35] 363 U. S. 564. [36] 363 U. S. 574. [37] 363 U. S. 593.

214

sional commands of the Norris-LaGuardia Act does not directly affect the "congressional policy in favor of the enforcement of agreements to arbitrate grievance disputes" [38] at all for it does not impair the right of an employer to obtain an order compelling arbitration of any dispute that may have been made arbitrable by the provisions of an effective collective bargaining agreement. At the most, what is involved is the question of whether the employer is to be allowed to enjoy the benefits of an injunction along with the right which Congress gave him in § 301 to sue for breach of a collective agreement. And as we have already pointed out, Congress was not willing to insure that enjoyment to an employer at the cost of putting the federal courts back into the business of enjoining strikes and other related peaceful union activities.

It is doubtless true, as argued, that the right to sue which § 301 gives employers would be worth more to them if they could also get a federal court injunction to bar a breach of their collective bargaining agreements. Strong arguments are made to us that it is highly desirable that the Norris-LaGuardia Act be changed in the public interest. If that is so, Congress itself might see fit to change that law and repeal the anti-injunction provisions of the Act insofar as suits for violation of collective agreements are concerned, as the House bill under consideration originally provided. It might, on the other hand, decide that if injunctions are necessary, the whole idea of enforcement of these agreements by private suits should be discarded in favor of enforcement through the administrative machinery of the Labor Board, as Senator Taft provided in his Senate bill. Or it might decide that neither of these methods is entirely satisfactory and turn instead to a completely new approach. The question of what

---

[38] *Textile Workers Union* v. *Lincoln Mills*, 353 U. S. 448, at 458–459.

change, if any, should be made in the existing law is one of legislative policy properly within the exclusive domain of Congress—it is a question for lawmakers, not law interpreters. Our task is the more limited one of interpreting the law as it now stands. In dealing with problems of interpretation and application of federal statutes, we have no power to change deliberate choices of legislative policy that Congress has made within its constitutional powers. Where congressional intent is discernible—and here it seems crystal clear—we must give effect to that intent.[39]

The District Court was correct in dismissing Count 3 of petitioner's complaint for lack of jurisdiction under the Norris-LaGuardia Act. The judgment of the Court of Appeals affirming that order is therefore

*Affirmed.*

MR. JUSTICE FRANKFURTER took no part in the consideration or decision of this case.

MR. JUSTICE BRENNAN, with whom MR. JUSTICE DOUGLAS and MR. JUSTICE HARLAN join, dissenting.

I believe that the Court has reached the wrong result because it has answered only the first of the questions which must be answered to decide this case. Of course § 301 of the Taft-Hartley Act did not, for purposes of

---

[39] We have not ignored Sinclair's argument that to apply the Norris-LaGuardia Act here would deprive it of its constitutional right to equal protection of the law, both because of an allegedly unlawful discrimination between Taft-Hartley Act employers and Railway Labor Act employers by virtue of the decision in *Chicago River*, and because of an allegedly unlawful discrimination between Taft-Hartley Act employers and unions by virtue of the decision in *Lincoln Mills*. We deem it sufficient to say that we do not find either of these arguments compelling.

actions brought under it, "repeal" § 4 of the Norris-LaGuardia Act. But the two provisions do coexist, and it is clear beyond dispute that they apply to the case before us in apparently conflicting senses. Our duty, therefore, is to seek out that accommodation of the two which will give the fullest possible effect to the central purposes of both. Since such accommodation is possible, the Court's failure to follow that path leads it to a result—not justified by either the language or history of § 301—which is wholly at odds with our earlier handling of directly analogous situations and which cannot be woven intelligibly into the broader fabric of related decisions.

## I.

Section 301 of the Taft-Hartley Act, enacted in 1947, authorizes Federal District Courts to entertain "[s]uits for violation of contracts between an employer and a labor organization . . . ." It does not in terms address itself to the question of remedies. As we have construed § 301, it casts upon the District Courts a special responsibility to carry out contractual schemes for arbitration, by holding parties to that favored process for settlement when it has been contracted for, and by then regarding its result as conclusive.[1] At the same time, § 4 of the Norris-LaGuardia Act, enacted in 1932, proscribes the issuance by federal courts of injunctions against various concerted activities "in any case involving or growing out of any labor dispute." But the enjoining of a strike over an arbitrable grievance may be indispensable to the effective enforcement of an arbitration scheme in a collective agreement; thus the power to grant that injunctive remedy may be essential to the uncrippled performance of the Court's

---

[1] *Textile Workers* v. *Lincoln Mills*, 353 U. S. 448; *Steelworkers* v. *American Mfg. Co.*, 363 U. S. 564; *Steelworkers* v. *Warrior & Gulf Co.*, 363 U. S. 574; *Steelworkers* v. *Enterprise Corp.*, 363 U. S. 593.

function under § 301.[2] Therefore, to hold that § 301 did not repeal § 4 is only a beginning. Having so held, the Court should—but does not—go on to consider how it is to deal with the surface conflict between the two statutory commands.

The Court has long acted upon the premise that the Norris-LaGuardia Act does not stand in isolation. It is one of several statutes which, taken together, shape the national labor policy. Accordingly, the Court has recognized that Norris-LaGuardia does not invariably bar injunctive relief when necessary to achieve an important objective of some other statute in the pattern of labor laws. See *Brotherhood of Railroad Trainmen* v. *Chicago River R. Co.*, 353 U. S. 30; *Graham* v. *Brotherhood of Locomotive Firemen*, 338 U. S. 232; *Virginian R. Co.* v. *System Federation*, 300 U. S. 515, 562–563. In *Chicago River* we insisted that there "must be an accommodation of [the Norris-LaGuardia Act] and the Railway Labor Act so that the obvious purpose in the enactment of each is preserved." [3]

These decisions refusing inflexible application of Norris-LaGuardia point to the necessity of a careful inquiry whether the surface conflict between § 301 and § 4 is irreconcilable in the setting before us: a strike over a

---

[2] In *Teamsters Local* v. *Lucas Flour Co.*, 369 U. S. 95, we held that a strike over a dispute which a contract provides shall be settled exclusively by binding arbitration is a breach of contract despite the absence of a no-strike clause, saying, at p. 105: "To hold otherwise would obviously do violence to accepted principles of traditional contract law. Even more in point, a contrary view would be completely at odds with the basic policy of national labor legislation to promote the arbitral process as a substitute for economic warfare." And in *Brotherhood of Railroad Trainmen* v. *Chicago River R. Co.*, 353 U. S. 30, 39, we recognized that allowing a strike over an arbitrable dispute would effectively "defeat the jurisdiction" of the arbitrator.

[3] 353 U. S., at 40.

grievance which both parties have agreed to settle by binding arbitration. I think that there is nothing in either the language of § 301 or its history to prevent § 4's here being accommodated with it, just as § 4 was accommodated with the Railway Labor Act.

## II.

It cannot be denied that the availability of the injunctive remedy in this setting is far more necessary to the accomplishment of the purposes of § 301 than it would be detrimental to those of Norris-LaGuardia. *Chicago River* makes this plain. We there held that the federal courts, notwithstanding Norris-LaGuardia, may enjoin strikes over disputes as to the interpretation of an existing collective agreement, since such strikes flout the duty imposed on the union by the Railway Labor Act to settle such "minor disputes" by submission to the National Railroad Adjustment Board rather than by concerted economic pressures. We so held, even though the Railway Labor Act contains no express prohibition of strikes over "minor disputes," because we found it essential to the meaningful enforcement of that Act—and because the existence of mandatory arbitration eliminated one of the problems to which Norris-LaGuardia was chiefly addressed, namely, that "the injunction strips labor of its primary weapon without substituting any reasonable alternative." [4]

That reasoning is applicable with equal force to an injunction under § 301 to enforce a union's contractual duty, also binding on the employer, to submit certain disputes to terminal arbitration and to refrain from striking over them. The federal law embodied in § 301 stresses the effective enforcement of such arbitra-

---

[4] *Id.*, at 41.

tion agreements. When one of them is about to be sabotaged by a strike, § 301 has as strong a claim upon an accommodating interpretation of § 4 as does the compulsory arbitration law of the Railway Labor Act. It is equally true in both cases that "[an injunction] alone can effectively guard the plaintiff's right," *Machinists* v. *Street*, 367 U. S. 740, 773. It is equally true in both cases that the employer's specifically enforceable obligation to arbitrate provides a "reasonable alternative" to the strike weapon. It is equally true in both cases that a major contributing cause for the enactment of Norris-LaGuardia—the at-largeness of federal judges in enjoining activities thought to seek "unlawful ends" or to constitute "unlawful means" [5]—is not involved. Indeed, there is in this case a factor weighing in favor of the issuance of an injunction which was not present in *Chicago River:* [6] the express contractual commitment of the union to refrain from striking, viewed in light of the overriding purpose of § 301 to assist the enforcement of collective agreements.

In any event, I should have thought that the question was settled by *Textile Workers* v. *Lincoln Mills*, 353 U. S. 448. In that case, the Court held that the procedural requirements of Norris-LaGuardia's § 7, although in terms fully applicable, would not apply so as to frustrate a federal court's effective enforcement under § 301 of an employer's obligation to arbitrate. It is strange, I think, that § 7 of the Norris-LaGuardia Act need not be read, in the face of § 301, to impose inapt procedural restrictions upon the specific enforcement of an employer's

---

[5] See, *e. g.*, S. Rep. No. 163, 72d Cong., 1st Sess., p. 18; Frankfurter and Greene, The Labor Injunction, pp. 24–46, 200, 202.

[6] It is worth repeating that the Railway Labor Act incorporates no express prohibition of strikes over "minor disputes."

220

contractual duty to arbitrate; but that § 4 must be read, despite § 301, to preclude absolutely the issuance of an injunction against a strike which ignores a union's identical duty.

### III.

The legislative history of § 301 affords the Court no refuge from the compelling effect of our prior decisions. That history shows that Congress considered and rejected "the advisability of repealing the Norris-LaGuardia Act insofar as suits based upon breach of collective bargaining agreements are concerned . . . ."[7] But congressional rejection of outright repeal certainly does not imply hostility to an attempt by the courts to accommodate all statutes pertinent to the decision of cases before them. Again, the Court's conclusion stems from putting the wrong question. When it is appreciated that there is no question here of "repeal," but rather one of how the Court is to apply the whole statutory complex to the case before it, it becomes clear that the legislative history does not support the Court's conclusion. First, however, it seems appropriate to discuss, as the Court has done, the language of § 301 considered in light of other provisions of the statute.

There is nothing in the words of § 301 which so much as intimates any limitation to damage remedies when the asserted breach of contract consists of concerted activity. The section simply authorizes the District Courts to entertain and decide suits for violation of collective contracts. Taking the language alone, the irresistible implication would be that the District Courts were to employ their regular arsenal of remedies appropriately to the situation. That would mean, of course, that injunctive relief could be afforded when damages would not be an adequate remedy. This much, surely, is settled by *Lin-*

[7] *Ante,* p. 205.

*coln Mills.* But the Court reasons that the failure of § 301 explicitly to repeal § 4 of Norris-LaGuardia completely negates the availability of injunctive relief in any case where that provision—in the absence of § 301—would apply. That reasoning stems from attaching undue significance to the fact that express repeal of Norris-LaGuardia provisions may be found in certain other sections of the Taft-Hartley Act—from which the Court concludes "not only that Congress was completely familiar with those provisions but also that it regarded an express declaration of inapplicability as the normal and proper manner of repealing them *in situations where such repeal seemed desirable.*" [8] Even on this analysis the most that can be deduced from such a comparative reading is that while repeal of Norris-LaGuardia seemed desirable to Congress in certain other contexts, repeal did not seem desirable in connection with § 301.

Sound reasons explain why repeal of Norris-LaGuardia provisions, acceptable in other settings, might have been found ill-suited for the purpose of § 301. And those reasons fall far short of a design to preclude absolutely the issuance under § 301 of any injunction against an activity included in § 4 of Norris-LaGuardia. Section 10 (h) of the Act [9] simply lifts the § 4 barrier in connection with proceedings brought by the National Labor Relations Board—in the Courts of Appeals for enforcement of Board cease-and-desist orders against unfair labor practices, and in the District Courts for interlocutory relief against activities being prosecuted before the Board as unfair labor practices. This repeal in aid of government litigation to enforce carefully drafted prohibitions already in the Act as unfair labor practices was, obviously, entirely

---

[8] *Ante,* p. 205. (Emphasis added.)

[9] National Labor Relations Act, § 10 (h), 61 Stat. 149, 29 U. S. C. § 160 (h).

appropriate, definitely limited in scope, predictable in effect, and devoid of any risk of abuse or misunderstanding. Much the same is true of § 208 (b) of Taft-Hartley,[10] which simply repeals Norris-LaGuardia in a case where the Attorney General seeks an injunction at the direction of the President, who must be of the opinion—after having been advised by a board of inquiry—that continuation of the strike in question would imperil the national health and safety.

Only in § 302 (e) of Taft-Hartley [11] is there found a repeal of Norris-LaGuardia's anti-injunction provisions in favor of a suit by a private litigant.[12] The District Courts are there authorized to restrain the payment by employers and the acceptance by employee representatives of unauthorized payments in the nature of bribes. Not only is the problem thus dealt with "unusually sensitive and important," as the Court notes,[13] but the repeal of Norris-LaGuardia is clearly, predictably, and narrowly confined to one kind of suit over one kind of injury; and obviously it presents no possible threat to the important purposes of that Act.

How different was the problem posed by § 301, which broadly authorized District Courts to decide suits for breach of contract. The Congress understandably may not have felt able to predict what provisions would crop up in collective bargaining agreements, to foresee the settings in which these would become subjects of litiga-

---

[10] 61 Stat. 155, 29 U. S. C. § 178.

[11] 61 Stat. 158, 29 U. S. C. § 186 (e).

[12] Section 301 (e), 61 Stat. 157, 29 U. S. C. § 185 (e), also mentioned by the Court, has no bearing on injunction problems. It repeals, for its purposes, § 6 of the Norris-LaGuardia Act, which deals with agency responsibility for concerted activities. Its only relevance here is in showing what is clear anyway: That § 301 effected no repeal of the anti-injunction provisions of Norris-LaGuardia.

[13] *Ante*, p. 205, n. 19.

tion, or to forecast the rules of law which the courts would apply. The consequences of repealing the anti-injunction provisions in this context would have been completely unknowable, and outright repeal, therefore, might well have seemed unthinkable. Congress, clearly, had no intention of abandoning wholesale the Norris-LaGuardia policies in contract suits; but it does not follow that § 301 is not the equal of § 4 in cases which implicate both provisions.

Indeed, it might with as much force be said that Congress knew well how to limit remedies against employee activities to damages when that was what it intended, as that Congress knew how to repeal Norris-LaGuardia when *that* was what it intended. Section 303 of Taft-Hartley [14] authorizes private actions *for damages* resulting from certain concerted employee activities. When that section was introduced on the Senate floor, it provided for injunctive relief as well. Extended debate revealed strong sentiment against the injunction feature, which incorporated a repeal of Norris-LaGuardia. The section's supporters, therefore, proposed a different version which provided for damages only. In this form, the section was adopted by the Senate—and later by the Conference and the House.[15] Certainly, after this experience Congress would have used language confining § 301 to damage remedies when it was invoked against concerted activity, if such had been the intention.

The statutory language thus fails to support the Court's position. The inference is at least as strong that Congress was content to rely upon the courts to resolve any seeming conflicts between § 301 and § 4 as they arose in the relatively manageable setting of particular cases, as that Congress intended to limit to damages the reme-

[14] 29 U. S. C. § 187.
[15] See II Leg. Hist. 1323–1400; I Leg. Hist. 571.

dies courts could afford against concerted activities under § 301. The Court then should so exercise its judgment as best to effect the most important purposes of each statute. It should not be bound by inscrutable congressional silence to a wooden preference for one statute over the other.

Nor does the legislative history of § 301 suggest any different conclusion. As the Court notes, the House version would have repealed Norris-LaGuardia in suits brought under the new section.[16] The Senate version of § 301, like the section as enacted, did not deal with Norris-LaGuardia, but neither did it limit the remedies available against concerted activity.[17] Thus any attempt to ascertain the Senate's intention would face the same choices as those I have suggested in dealing with the language of § 301 as finally enacted. It follows that to construe the Conference Committee's elimination of the House repeal as leaving open the possibility of judicial accommodation is at least as reasonable as to conclude that Congress, by its silence, was directing the courts to disregard § 301 whenever opposition from § 4 was encountered.[18]

I emphasize that the question in this case is not whether the basic policy embodied in Norris-LaGuardia against the injunction of activities of labor unions has been abandoned in actions under § 301; the question is simply whether injunctions are barred against strikes over griev-

---

[16] I Leg. Hist. 221–222.

[17] I Leg. Hist. 279–280.

[18] There is nothing in any Committee Report, or in any floor debate, which even intimates a confinement of § 301 remedies to damages in cases involving concerted activities. The only bit of legislative history which could is the statement of Senator Taft, quoted by the Court at note 27 of its opinion, which he inserted into the Congressional Record. What little significance that isolated insertion might have had has, of course, been laid to rest by *Lincoln Mills*.

ances which have been routed to arbitration by a contract specifically enforceable against both the union and the employer. Enforced adherence to such arbitration commitments has emerged as a dominant motif in the developing federal law of collective bargaining agreements. But there is no general federal anti-strike policy; and although a suit may be brought under § 301 against strikes which, while they are breaches of private contracts, do not threaten any additional public policy, in such cases the anti-injunction policy of Norris-LaGuardia should prevail. Insistence upon strict application of Norris-LaGuardia to a strike over a dispute which both parties are bound by contract to arbitrate threatens a leading policy of our labor relations law. But there may be no such threat if the union has made no binding agreement to arbitrate; and if the employer cannot be compelled to arbitrate, restraining the strike would cut deep into the core of Norris-LaGuardia. Therefore, unless both parties are so bound, limiting an employer's remedy to damages might well be appropriate. The susceptibility of particular concrete situations to this sort of analysis shows that rejection of an outright repeal of § 4 was wholly consistent with acceptance of a technique of accommodation which would lead, in some cases, to the granting of injunctions against concerted activity. Accommodation requires only that the anti-injunction policy of Norris-LaGuardia not intrude into areas, not vital to its ends, where injunctive relief is vital to a purpose of § 301; it does not require unconditional surrender.

## IV.

Today's decision cannot be fitted harmoniously into the pattern of prior decisions on analogous and related matters. Considered in their light, the decision leads inescapably to results consistent neither with any imaginable legislative purpose nor with sound judicial administration.

We have held that uniform doctrines of federal labor law are to be fashioned judicially in suits brought under § 301, *Textile Workers* v. *Lincoln Mills,* 353 U. S. 448; that actions based on collective agreements remain cognizable in state as well as federal courts, *Dowd Box Co.* v. *Courtney,* 368 U. S. 502; and that state courts must apply federal law in such actions, *Teamsters Local* v. *Lucas Flour Co.,* 369 U. S. 95.

The question arises whether today's prohibition of injunctive relief is to be carried over to state courts as a part of the federal law governing collective agreements. If so, § 301, a provision plainly designed to *enhance* the responsibility of unions to their contracts, will have had the opposite effect of depriving employers of a state remedy they enjoyed prior to its enactment.

On the other hand if, as today's literal reading suggests [19] and as a leading state decision holds,[20] States remain free to apply their injunctive remedies against concerted activities in breach of contract, the development of a uniform body of federal contract law is in for hard times. So long as state courts remain free to grant the injunctions unavailable in federal courts, suits seeking relief against concerted activities in breach of contract will be channeled to the States whenever possible. Ironically, state rather than federal courts will be the preferred instruments to protect the integrity of the arbitration process, which *Lincoln Mills* and the *Steelworkers* decisions forged into a kingpin of federal labor policy. Enunciation of uniform doctrines applicable in such cases will be severely impeded. Moreover, the type of relief available in a particular instance will turn on fortuities

[19] Section 4 commences: "No court of the United States shall have jurisdiction to issue any restraining order . . . ."

[20] *McCarroll* v. *Los Angeles County District Council,* 49 Cal. 2d 45, 315 P. 2d 322.

of locale and susceptibility to process—depending upon which States have anti-injunction statutes and how they construe them.

I have not overlooked the possibility that removal of the state suit to the federal court might provide the answer to these difficulties. But if § 4 is to be read literally, removal will not be allowed.[21] And if it is allowed, the result once again is that § 301 will have had the strange consequence of taking away a contract remedy available before its enactment.

## V.

The decision deals a crippling blow to the cause of grievance arbitration itself. Arbitration is so highly regarded as a proved technique for industrial peace that even the Norris-LaGuardia Act fosters its use.[22] But since unions cannot be enjoined by a federal court from striking in open defiance of their undertakings to arbitrate, employers will pause long before committing themselves to obligations enforceable against them but not against their unions. The Court does not deny the desirability, indeed, necessity, for injunctive relief against a strike over an arbitrable grievance.[23] The Court says only that federal courts may not grant such relief, that Congress must amend § 4 if those courts are to give substance to the congressional plan of encouraging peaceable settlements of grievances through arbitration.

---

[21] Compare note 19, *supra,* with the language of the removal statute, 28 U. S. C. § 1441, allowing removal in cases "of which the district courts of the United States have original jurisdiction."

[22] See Norris-LaGuardia Act, § 8, 47 Stat. 72, 29 U. S. C. § 108.

[23] The Court acknowledges, of course, that an employer may obtain an order directing a union to comply with its contract to arbitrate. Consistently with what we said in *Lucas, supra,* note 2, a strike in the face of such an order would risk a charge of contempt.

228

## VI.

A District Court entertaining an action under § 301 may not grant injunctive relief against concerted activity unless and until it decides that the case is one in which an injunction would be appropriate despite the Norris-LaGuardia Act. When a strike is sought to be enjoined because it is over a grievance which both parties are contractually bound to arbitrate, the District Court may issue no injunctive order until it first holds that the contract *does* have that effect; and the employer should be ordered to arbitrate, as a condition of his obtaining an injunction against the strike. Beyond this, the District Court must, of course, consider whether issuance of an injunction would be warranted under ordinary principles of equity—whether breaches are occurring and will continue, or have been threatened and will be committed; whether they have caused or will cause irreparable injury to the employer; and whether the employer will suffer more from the denial of an injunction than will the union from its issuance.

In the case before us, the union enjoys the contractual right to make the employer submit to final and binding arbitration of any employee grievance. At the same time, the union agrees that "[T]here shall be no strikes . . . for any cause which is or may be the subject of a grievance." [24] The complaint alleged that the union had, over the past several months, repeatedly engaged in "quickie" strikes over arbitrable grievances. Under the contract and the complaint, then, the District Court might conclude that there have occurred and will continue to occur breaches of contract of a type to which the principle of accommodation applies. It follows that rather than dismissing the complaint's request for an injunction, the

[24] See *Atkinson* v. *Sinclair Rfg. Co.*, decided this day, *post*, p. 238.

Court should remand the case to the District Court with directions to consider whether to grant the relief sought— an injunction against future repetitions. This would entail a weighing of the employer's need for such an injunction against the harm that might be inflicted upon legitimate employee activity. It would call into question the feasibility of setting up *in futuro* contempt sanctions against the union (for striking) and against the employer (for refusing to arbitrate) in regard to prospective disputes which might fall more or less clearly into the adjudicated category of arbitrable grievances. In short, the District Court will have to consider with great care whether it is possible to draft a decree which would deal equitably with all the interests at stake.

I would reverse the Court of Appeals and remand to the District Court for further proceedings consistent with this dissenting opinion.