REYNOLDS ELECTRICAL & ENGINEERING CO., INC., APPELLANT, v. UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA, LOCAL UNION 1780, ET AL., RESPONDENTS.

No. 4761

April 23, 1965                           401 P.2d 60

[Rehearing denied May 24, 1965]

*John W. Douglas,* Assistant United States Attorney General; *Morton Hollander* and *John C. Eldridge,* Attorneys, Department of Justice; all of Washington, D.C.; and *John W. Bonner,* United States Attorney, of Las Vegas, for Appellant.

*Morton Galane,* and *George Rudiak,* of Las Vegas, for Respondents.

## O P I N I O N

By the Court, THOMPSON, J.:

The appeal is from a judgment declaring that Reynolds Electrical and Engineering Co., Inc. (Reynolds)

breached its collective bargaining agreements with various unions,[1] and directing Reynolds to place into effect, retroactively, and maintain certain travel time and shift differential pay practices which had been in effect before December 10, 1962.

Reynolds is an employer in interstate commerce within the intendment of Sec. 301(a) of the Labor Management Relations Act of 1947, 61 Stat. 156, 29 U.S.C. 185(a), and engaged by the United States government as a cost-plus contractor in the construction, maintenance and support activities for the Atomic Energy Commission (AEC) at the Nevada test site. The event precipitating this litigation was a strike called and a picket line established by the unions at the test site in April 1963. Each of the collective bargaining agreements (except those of the Painters and Plumbers which express a purpose not to strike, but do not contain a no-strike promise) provides that there would be no strikes and that grievances would be handled according to a specified procedure.[2] The main question below, and here, is whether the dispute about the interpretation and/or application of those agreements to travel time pay and shift differential pay must be resolved by the specified grievance and arbitration procedures. The lower court assumed the authority to exercise remedial power and resolved the dispute on the merits. It believed it proper to do so because, in its view, the dispute was not arbitrable and, in any event, Reynolds had waived and repudiated the grievance and arbitration procedures. We have concluded that the judgment below must be set aside (except as

[1]The unions are: United Brotherhood of Carpenters & Joiners of America, Local 1780; Operative Plasterers & Cement Masons, International Association, Local 797; International Hod Carriers & Common Laborers, Local 872; International Union of Operating Engineers, Local 12; Brotherhood of Painters, Decorators & Paperhangers of America, Local 159; International Brotherhood of Electrical Workers, Local 357; International Association of Bridge, Structural & Ornamental Ironworkers, Local 433; United Association of Journeymen & Apprentices of the Plumbing & Pipefitting Industry, Local 525; Sheetmetal Workers International Association, Local 88; International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America, Local 631.

[2]See Appendix A where the relevant provisions of each agreement are set forth.

to Sheet Metal Workers Union, Local 88) because of controlling decisions by the United States Supreme Court, to be hereinafter discussed.

When the unions called a strike and established a picket line, Reynolds immediately filed suit to enjoin the strike, work stoppage and picketing. The unions filed responsive pleadings and, by counterclaim, sought a declaratory judgment that the collective bargaining agreements required Reynolds to restore the pay practices which were in effect before December 10, 1962. Reynolds filed its reply asserting, inter alia, that the controversy should be resolved through the grievance and arbitration procedures provided for by the collective bargaining agreements. For reasons not material here, Reynolds chose not to pursue its complaint for injunctive relief and offered no evidence in support thereof. The case was tried upon issues framed by the counterclaims of the unions and Reynolds' reply thereto, and resulted in the judgment from which Reynolds has appealed. As Reynolds abandoned its complaint to enjoin the strike, we are not faced with the issue of the power of a state court to issue an anti-strike injunction in a Sec. 301 case. (Cf. Sinclair Ref. Co. v. Atkinson, 370 U.S. 195, holding that in a suit brought under Sec. 301 of the Labor Management Relations Act, the federal court is barred from issuing an injunction against a strike over an allegedly arbitrable grievance in violation of a no-strike agreement; McCarroll v. Los Angeles County Dist. Council of Carpenters, 49 Cal.2d 45, 315 P.2d 322, holding that the injunctive remedial power of a state court is available in such a case; see article by Benjamin Aaron, "Strikes in Breach of Collective Agreements," 63 Colum.L.Rev. 1027, suggesting that the United States Supreme Court should now rule that state courts should be prohibited from granting injunctions in such a case.) Our sole concern is whether the dispute about the interpretation and/or application of the collective bargaining agreements to travel time and shift differential pay must be resolved by the grievance and arbitration procedures. We turn to briefly explain the grievances.

The travel time pay dispute involves union employees of Reynolds who work at a particular area on the Nevada test site called "Area 400" or "NRDS" (Nuclear Reactor Development Station). Such employees live either away from the test site and travel every day to and from the site, or utilize lodge and boarding facilities at campsites located at various places on the Nevada test site. For several years the employees had reported to work at various reporting points on the test site, and Reynolds supplied transportation from the reporting points to the job site where they were to work. The reporting points were normally campsites. The employees were paid for the time during which they were transported from reporting points to job sites, and this pay is the travel time pay with which this case is concerned. None of the collective bargaining agreements specify the locations of reporting points. The reporting points were either designated by Reynolds before a particular job started or were agreed upon through negotiation with the unions.

Before December 1962 for basic trade employees (carpenters and joiners, plasterers and cement masons, hod carriers and laborers, operating engineers, painters), and before March 1963 for specialty trade employees (electrical workers, ironworkers, plumbers and pipefitters, and sheet metal workers), Area 400 was not a reporting point. Employees working at Area 400 reported to work at other places and were transported to and from, and received pay for the time spent in traveling to and from their reporting points and Area 400. Many of these employees reported for work at a campsite known as Camp Mercury, some distance from the job.

In December 1962 Reynolds designated Area 400 itself as the reporting point for basic trade employees working in Area 400, and in March 1963 did the same for specialty trade employees working there. Travel time pay for employees who had theretofore reported to Camp Mercury was stopped. Reynolds did so at the direction of the Atomic Energy Commission. A campsite was not established at Area 400. A grievance resulted. The unions contend that those employees who had previously

reported at Camp Mercury and had been given travel time pay and transportation from Camp Mercury to Area 400 and return, are still entitled to such pay even though the reporting point was changed. Reynolds does not agree.

The shift differential pay dispute concerns only Reynolds and the Teamsters Union. The other unions do not object to the December 1962 change in practice with respect to the shift differential pay. Before 1962 employees working the swing shift worked seven hours per day, but were paid for eight. In December 1962 this practice was changed, and the employees were paid on the basis of hours actually worked, with a 10% premium for employees on the second shift, and a 20% premium for employees on the third shift. This change was suggested by some unions for whom it was advantageous. However, the new practice was less favorable than the old to the Teamsters, and gave rise to an additional grievance in that union.

We have stated the grievances in skeleton form. A mass of evidence was received about the many meetings held during 1961 and 1962 between representatives of the employer, the AEC, and the unions, pointing to the consummation of a Master Construction Industry Agreement (MCIA); about the interest of the Secretary of Labor, the Director of the Federal Mediation and Conciliation Service, the Chairman of the AEC, and others in the adoption of a MCIA. Some of that evidence may be relevant to the interpretation and/or application of the provisions of the collective bargaining agreements to the travel time pay and shift differential pay disputes. However, we shall not refer to that evidence here, for two reasons. First, because controlling law demands that the grievances be first submitted to and resolved by the contractual procedures agreed upon; and, second, if we were to discuss all of the contentions on either side resulting from the whole story, we would necessarily intimate an opinion upon the merits, and perhaps influence the grievance and arbitration procedures to be carried out. This would not be appropriate.

The United States Supreme Court has made it clear that Sec. 301(a) creates a federal substantive law governing collective bargaining agreements affecting interstate commerce.[3] Textile Workers v. Lincoln Mills, 353 U.S. 448. Incompatible doctrines of local law must give way to principles of federal law. Teamsters Local v. Lucas Flour Co., 369 U.S. 95. The national labor policy expressed by Congress, and reflected by the decisions of the high court, leaves little room for court intrusion except to compel arbitration "made arbitrable by the provisions of an effective collective bargaining agreement," Sinclair Refining Co. v. Atkinson, 370 U.S. 195, or, in some circumstances, to permit a suit against the unions for damages resulting from a breach of a no-strike clause. Atkinson v. Sinclair Ref. Co., 370 U.S. 238. Contract grievance procedures are expressly approved by Congress as a preferred method for settling disputes, L.M.R.A. Sec. 203(d), 29 U.S.C. 173(d); 201(c), 29 U.S.C. 171(c); Republic Steel Corp. v. Maddox, 379 U.S. 650, and the policy of the national labor law will be effectuated only if the means chosen by the parties to settle their differences under a collective bargaining agreement is given full play. Steelworkers v. American Mfg. Co., 363 U.S. 564.

The cited cases were litigated in federal courts. The instant matter was litigated in our state court. Though federal law governs, it does not follow that state courts are without jurisdiction to effectuate the federal policy. Concurrent jurisdiction exists unless Congress has expressly excluded state court power. Claflin v. Houseman, 93 U.S. 130; Packing House Workers v. Needham Packing Co., 376 U.S. 247; McCarroll v. Los Angeles

---

[3]Sec. 301(a) of the L.M.R.A. of 1947, 61 Stat. 156, 29 U.S.C. 185(a) reads: "Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties."

County Dist. Council of Carpenters, 49 Cal.2d 45, 315 P.2d 322. Section 301 does not expressly exclude state power. Thus, our state court had jurisdiction to entertain this suit and afford a remedy to effectuate federal policy or to deny all requested relief, should the relief sought contravene federal policy. As before stated, the request for an injunction against the strike was abandoned by the employer and we need not, therefore, decide whether the injunctive remedial power of a state court is available in a Section 301 case. With these foundation principles in mind, we turn to resolve the issues raised by the counterclaims of the unions and Reynolds' reply thereto, viz., are the grievances here involved arbitrable and, if so, did the employer either waive the contract settlement procedures or frustrate them by repudiation?

*1. Arbitrability.* The lower court found that the contract provisions governing the pay practices here in question were not within the coverage of the grievance and arbitration clauses. It relied upon the rule of practical construction, noting that the pay practices which it ordered to be resumed had been in effect for many years under collective bargaining agreements containing the same pertinent language as the agreements now in issue. It reasoned that the meaning of the pertinent contract provisions had thereby become fixed and certain and, therefore, were not subject to the grievance procedures. Accordingly, the court concluded that the unilateral change of pay practices by Reynolds was a breach of the contracts authorizing resort to the court's remedial powers. In our view the lower court's position in this regard is not supportable.

As before indicated Congress has encouraged employers and unions to work out a desirable method for settlement of grievance disputes arising over the interpretation and application of collective bargaining agreements. L.M.R.A., Sec. 203(d), 29 U.S.C., Sec. 173(d). That expression of national policy has been, from time to time, further defined by the United States Supreme Court, and standards developed for determining arbitrability. United Steelworkers v. American Mfg. Co., 363 U.S. 564; United Steelworkers v. Enterprise Wheel &

Car Co., 363 U.S. 593; United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574. The trilogy of decisions reveals the Supreme Court's intention to preclude court intervention into the merits of a labor dispute where grievance and arbitration procedures have been contractually provided for.

In the American Manufacturing case, supra, at page 569 the court stated: "* * * When the judiciary undertakes to determine the merits of a grievance under guise of interpreting the grievance procedure of collective bargaining agreements, it usurps a function which under that regime is entrusted to the arbitration tribunal." Further it said [page 568]: "The courts, therefore, have no business weighing the merits of the grievance, considering whether there is * * * particular language in the written instrument which will support the claim. The agreement is to submit all grievances to arbitration, not merely those which the court will deem meritorious. The processing of even frivolous claims may have therapeutic values of which those who are not a part of the plant environment may be quite unaware."

In Warrior & Gulf, supra, [page 582], the court wrote: "An order to arbitrate the particular evidence should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible to an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." In Enterprise Wheel and Car Co. [page 597], supra, appears this language: "When an arbitrator is commissioned to interpret and apply the collective bargaining agreement, he is to bring his informed judgment to bear in order to reach a fair solution of a problem. This is especially true when it comes to formulating remedies. There the need is for flexibility in meeting a wide variety of situations."

In the instant matter it may not be said with positive assurance that the coverage clauses of the agreements before us are not susceptible to an interpretation that

covers the disputes. The coverage provisos are broad in scope,[4] and the contractual arrangements about travel time pay are, we believe, subject to interpretation,[5] simply because none of the agreements, except the Sheet Metal Workers agreement, expressly, or by necessary implication, preclude the employer from designating Area 400 as a campsite or require the employer to supply living quarters there, if it is so designated. We do not mean to suggest what the outcome of the travel time pay dispute should be. We state only that the unions' claims for travel time pay rest upon terms of the collective bargaining agreements which are open to the interpretive processes embraced by the grievance procedures agreed upon. Indeed when the lower court relied upon the "rule of practical construction" to reach the result

[4]Pertinent abbreviated excerpts from the agreements are:

*Carpenters*: "This committee shall take evidence relative to violation, interpretations, adherence and grievances * * *."

*Laborers*: "That it is the purpose and intent of the parties hereto that all grievances or disputes arising between them over the interpretation or application of the terms of this agreement * * *."

*Operating Engineers*: "It is agreed by the parties hereto that all grievances or disputes arising between them over the interpretation or application of the terms of this agreement * * *."

*Painters*: "The committee shall be vested with power to adjust disputes and grievances that may arise and shall be empowered to interpret and make such rules and regulations as may be necessary to give force and effect to the intent, purpose and meaning of the agreement."

*Sheet Metal*: "Grievances of the employer or the union, arising out of interpretation or enforcement of this agreement * * *."

*Electrical Workers*: "All questions or disputes which are not adjusted between the union and the employer shall be referred to this committee. * * *"

*Iron Workers*: "Boards of Adjustment shall be created for the settlement of disputes, except jurisdictional disputes, which shall * * *."

*Plumbers*: "The joint committee is hereby vested with power to adjust all labor disputes and grievances which may arise * * *, and is also hereby vested with the power to interpret this agreement * * *."

*Teamsters*: "All disputes or grievances arising out of the interpretation or application of the terms or conditions of this agreement * * *."

[5]See Appendix B where the travel time pay provisions are substantially set forth.

it did, it indulged in interpretation, for that rule is a rule of interpretation. 3 Corbin § 558; Woods v. Bromley, 69 Nev. 96, 241 P.2d 1103; Holland v. Crummer Corp., 78 Nev. 1, 368 P.2d 63.

The Sheet Metal agreement contains a clause not present in the others, to wit: "If adequate living quarters are not provided at the jobsite, in addition to the subsistence, the employee shall receive travel time and mileage, as provided herein, from the nearest place that living quarters are available." The agreement also demands that all grievances "arising out of the interpretation and enforcement of this agreement" shall be settled by the procedures therein specified. Thus, if one were to entertain the view that the sheet metal workers are entitled to travel time pay, still the enforcement of that right must come about through the procedures agreed upon. The language of the court in the American Manufacturing Co. case, supra, is particularly appropriate here. We repeat it: "The courts, therefore, have no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim. The agreement is to submit all grievances to arbitration, not merely those which the court will deem meritorious. The processing of even frivolous claims may have therapeutic values of which those who are not a part of the plant environment may be quite unaware."

The Sheet Metal Workers Union did utilize the grievance procedure specified in its contract[6] and the Local

---

[6]The grievance procedure in pertinent part reads: "Section 1. Grievances of the Employer or the Union, arising out of the interpretation or enforcement of this Agreement, shall be settled between the Employer directly involved and the duly authorized representative of the Union, if possible. An Employer may have the local Association present to act as his representative. Section 2. Grievances, not settled as provided in Section 1 of this Article may be appealed by either party to the Local Joint Adjustment Board in the area in which the work is performed and such Board shall meet promptly, but in no more than seven (7) calendar days following the request for its services, to render a final and binding determination, except as provided below." [The exceptions do not relate to the merits of this dispute and are not relevant. We have, therefore, omitted them.]

Adjustment Board ruled in its favor. The contract specifies that the Board's decision shall be final and binding. That decision determined that Reynolds was required to pay travel time. It also found that Reynolds had discontinued doing so because of a directive from the AEC. Reynolds has not complied with the Board's ruling, contending that it does not amount to an "award" because the Board failed to decide one point presented to it, namely: was AEC approval of pay practices an implied condition of the collective bargaining agreement between Reynolds and the Sheet Metal Workers? In our view the Board decided that question when it determined that Reynolds must pay travel time to the Sheet Metal Workers. Implicit in the ruling is the Board's conclusion that AEC approval is not an implied condition of payment. The Board "interpreted" this contention and resolved it against Reynolds. The merits of the dispute were decided in the manner agreed upon. The two-step grievance procedure was exhausted. A final and binding award was made in favor of the Sheet Metal Workers Union. No further grievance procedure was contemplated by the agreement. In these circumstances we do not hesitate to treat the counterclaim of the Sheet Metal Workers Union as a suit to enforce the award and affirm the judgment as to that union.

We proceed to the arbitrability of the shift differential pay dispute between Reynolds and the Teamsters Union. As in the case of the Sheet Metal Workers and its travel time dispute, one might consider the contract language about shift differential pay in the Teamsters' agreement to be unambiguous.[7] However, unlike the Sheet Metal Workers, the Teamsters did not exhaust the grievance procedures agreed upon. The parties had agreed to submit "all disputes or grievances arising out of the interpretation or application of the terms or conditions of this agreement" to the grievance procedures therein provided for. The first step in the procedure, that of submitting the dispute to the Joint

---

[7]The language: "When three (3) shifts are worked, each shift shall work seven (7) consecutive hours, exclusive of meal period, for which eight (8) hours' straight time shall be paid Monday through Friday."

Conference Board, was undertaken. The Board deadlocked. The second step, the selection of an impartial arbitrator, was started but not completed.[8] The shift differential pay dispute with the Teamsters, therefore, is not ripe for court enforcement.

We think it particularly significant that none of the collective bargaining contracts before us specifically exclude the disputes here involved from resolution by the grievance and arbitration processes. I.B.E.W. v. Westinghouse Electric Corp., 198 F.Supp. 817 (where the unions seek to sustain their judgment mainly on the proposition that the court ordered arbitration because the bargaining agreement contained no specific exclusionary language) ; cf. Communications Workers v. Telephone Co., 209 F.Supp. 389 (where arbitration was refused because of the exclusionary language of the contract). It seems to us that if Reynolds and the unions had been unwilling to accept the grievance and arbitration procedures as the means for adjusting the travel time and shift differential pay disputes, they

[8]The pertinent language is: "D. If a majority decision is reached by the Joint Conference Board, that decision shall be final and binding upon the parties to the dispute. In the event that a majority vote cannot be secured within twenty-four (24) hours by the Joint Conference Board, a deadlock shall be declared after which either the Association or the Union may refer the matter in dispute to an impartial arbiter in accordance with the following procedure:

"The party electing to arbitrate shall notify the other in writing of its desire to do so. Upon receipt of such notice the manager of the Association and the Secretary-Treasurer of the Union (or their designated representatives) shall attempt to select an impartial arbiter acceptable to both.

"If, within twenty-four (24) hours of receipt of the notice to arbitrate said representatives are unable to agree upon the impartial arbiter they shall jointly petition the Federal Mediation and Conciliation Service to submit a panel of five (5) names of persons qualified to act as the impartial arbiter. Upon receipt of said panel of names, the representative of the Union and the representative of the Association shall each alternately strike a name until four of the five names submitted have been eliminated. The fifth or remaining nominee shall be the impartial arbiter.

"The arbitration hearing shall be scheduled as soon as possible thereafter and the arbiter shall be required to issue his decision within forty-eight (48) hours of the close of the hearing unless the parties mutually agree, in writing, to an extension of time."

would have so expressed themselves by appropriate exclusionary language. John Wiley & Sons v. Livingston, 376 U.S. 543. None appears. For all of the reasons stated, we hold that the disputes before us are within the scope of the grievance and arbitration clauses of each of the collective bargaining agreements.

2. *Waiver or Repudiation of Arbitration.* The unions seek to sustain their judgment mainly on the proposition that Reynolds, by its conduct, either waived the contractual grievance and arbitration procedures, or repudiated them, thereby authorizing a court determination on the merits. We do not so view the record. It is, of course, possible for a flat waiver or repudiation to occur. The circumstances must be examined with care. In Drake Bakeries v. Bakery Workers, 370 U.S. 254, the United States Supreme Court stated, inter alia: "Arbitration provisions, which themselves have not been repudiated, are meant to survive breaches of contract, in many contexts, even total breach; and in determining whether one party has so repudiated his promise to arbitrate that the other party is excused the circumstances of the claimed repudiation are critically important." In the Drake Bakeries case the court held that where both parties are committed by contract to arbitrate their claims of breach of agreement, the fact that a union strikes rather than arbitrates its claims does not necessarily excuse an employer from its obligation to arbitrate. Accord: Packinghouse Workers v. Needham Packing Co., 376 U.S. 247; see also Annot., 8 L.Ed.2d 1013.

The language of the high court in Drake Bakeries is particularly significant here. Though the unions claim a repudiation, the record is devoid of evidence showing that the employer was unwilling to pursue the grievance procedures agreed upon. All of the evidence is the other way. The Carpenters Union sought to have arbitration waived. Reynolds refused. The Union then selected an arbitrator, but did not proceed further. The

Operating Engineers Union instituted grievance proceedings. The Joint Conference Committee, after hearing the evidence, deadlocked. The Union then requested that Reynolds waive the next step in the grievance procedure, and Reynolds refused. Nothing more was done. The Plumbers Union wrote Reynolds that the Union was willing to arbitrate. Reynolds responded, suggesting that the Union wait until conferences then in progress were concluded, for the matters in dispute were being discussed. Nothing further occurred. As before indicated, the Teamsters instituted grievance proceedings, but did not complete them. The Plasterers and Cement Masons, the Electrical Workers, the Ironworkers, the Laborers and the Painters did not seek to utilize the grievance procedures to resolve the travel time pay dispute. The evidence is uncontradicted that the employer willingly participated in every grievance procedure instituted and has steadfastly maintained throughout that the disputes be resolved as contractually agreed upon and not otherwise. "Arbitration provisions, which themselves have not been repudiated, are meant to survive breaches of contract, in many contexts, even total breach; * * *." Drake Bakeries v. Bakery Workers, supra. Here it is evident that the employer did not breach or repudiate the arbitration provisions of the various contracts. Its breach, if any occurred, was of the provisions of the agreements governing travel time and shift differential pay. That kind of a breach is survived by the arbitration provisions. Therefore, the unions' failure to arbitrate is not excused, nor has arbitration been waived or repudiated by Reynolds.[9]

The employer's unilateral change of pay practices does not, as a matter of law, constitute a repudiation of its promise to arbitrate. For the same reason, any indication in this record that the employer would not abide by a final and binding arbitration award without

[9] The cases relied upon by the unions are inapposite. In each there was a flat refusal by the employer to participate in the arbitration process. See In re Aller's Petition, 47 Cal.2d 189, 302 P.2d 294; Bertero v. Superior Court, 216 Cal.App.2d 213, 30 Cal.Rptr. 719; Council of West. Elec. v. Western Elect. Co., 2 Cir., 238 F.2d 892.

the approval of the AEC does not, as a matter of law, amount to a repudiation of its promise to arbitrate. An award, if made pursuant to the agreed procedures, may be enforced by a suit upon the award. United Steelworkers v. Enterprise Corp., 363 U.S. 593. Nor does the instant law suit, commenced by the employer, amount to a repudiation of its promise to arbitrate, for by this action Reynolds sought to preserve the status quo until the grievances could be resolved by the procedures contractually agreed upon.

The judgment below in favor of Sheet Metal Workers International Association, Local Union 88, is affirmed. In all other respects the judgment below is reversed.

BADT, J., and BOWEN, D. J., concur.

## APPENDIX A
### RELEVANT GRIEVANCE PROVISIONS

1. Carpenters:

"Whereas the parties to this Agreement are both convinced that it is to the best interest of themselves and the public in general that the construction industry be conducted on the basis of harmonious agreements, rather than protracted strikes or lockouts caused by misunderstandings or lack of cooperative effort, it is, therefore, agreed that a Joint Committee representing the parties to this Agreement shall be set up immediately and maintained throughout the life of this Agreement and any continuations thereof.

"This Joint Committee shall be known as the Labor Management Committee and shall be made up of two members with authorization to act for and represent Carpenters Local No. 1780, and two members of the General Contractors of Southern Nevada who are authorized to act for and represent the Contractors. It shall be the duty of this Committee to meet at least once each month to give consideration and study to the general and overall problems affecting the building industry in the area covered by this agreement for the good of this community and the Construction Industry. It shall be the duty of this Committee to assemble on two days notice, upon

request by either a representative of the General Contractors of Southern Nevada or the Secretary of Carpenters Local No. 1780.

"This Committee shall take evidence relative to violation, interpretations, adherence, and grievances presented to the Committee in writing, and shall decide on the evidence before it, and make a faithful effort to bring the parties together in final agreement within forty-eight hours. Should this Committee be unable to make a settlement within forty-eight hours, then the Committee shall present the matter together with the evidence to the General Contractors of Southern Nevada and Carpenters Local No. 1780 of Las Vegas, for their information only. The Committee shall, when deadlocked, at the end of forty-eight hours immediately select one man agreeable to the employer and one man agreeable to the Union, and these two selections shall immediately select a third man. These three shall review the evidence at hand and permit the parties to the dispute to be heard in defense of their position, and then render a decision which shall be final and binding on the parties to this Agreement. There shall be no stoppage of work during this interim period. The cost of such proceedings, if any, shall be borne equally by both parties."

2. Sheet Metal Workers:

"SECTION 1. Grievances of the Employer or the Union, arising out of interpretation or enforcement of this Agreement, shall be settled between the Employer directly involved and the duly authorized representative of the Union, if possible. An Employer may have the local Association present to act as his representative.

"SECTION 2. Grievances, not settled as provided in Section 1 of this Article may be appealed by either party to the Local Joint Adjustment Board in the area in which the work is performed and such Board shall meet promptly, but in no more than seven (7) calendar days following the request for its services, to render a final and binding determination, except as provided below. The Board shall consist of equal number of representatives of the Union and of the local Employers' Association and both sides shall cast an equal number of votes at each

meeting. The local Employers' Association, on its own initiative, may submit grievances for determination by the Board as provided in this Section.

"SECTION 3.   Grievances, not settled as provided in Section 2 of this Article because of a deadlock between the parties to the Local Joint Adjustment Board or because of failure of such Board to act, may be appealed by either party to a panel consisting of one (1) representative chosen by the Sheet Metal Workers' International Association and one (1) representative chosen by the Employer directly involved and such panel shall meet promptly, but in no more than seven (7) calendar days following a request for its services to render a final and binding determination, except as provided below.

"SECTION 4.   Grievances, not settled as provided in Section 3 of this Article because of a deadlock between the parties to the panel, may be appealed by either party to the National Joint Adjustment Board, as established by the Sheet Metal Workers' International Association and the Sheet Metal and Air Conditioning Contractors' National Association, Inc. Submissions shall be made and decisions rendered under such procedures as may be prescribed by such Board, from time to time, and mutually approved by the parties creating it. Copies of the procedures shall be available from, and submission of grievances may be made to either the General Secretary-Treasurer of the Sheet Metal Workers' International Association or the Executive Secretary of the Sheet Metal and Air Conditioning Contractors' National Association, Inc.

"SECTION 5.   Any decisions on appeals shall be in writing addressed to all parties interested in the grievances. Notice of appeal must be made within seven (7) days. Notice of appeal must be made within seven (7) days of notice of any decision of deadlock. There shall be no cessation of work by strike or lockout during the pendency of the procedures provided for in this Article.

"SECTION 6.   Nothing contained in this Article shall apply to any controversy or dispute arising out of any notice of reopening of this Agreement as provided in Article XIII thereof."

3. Laborers:

"A. That the craft steward, as defined in Section G of this Article, is to receive grievances or disputes from employees working in classifications of his craft, and shall immediately report them to his business agent or special representative who shall immediately attempt to adjust said grievance or dispute with the Contractor or his representative.

"B. Such business agent or special representative shall have access to the project during working hours for the purpose of adjusting grievances or disputes and shall make every reasonable effort to advise the Contractor or his representative of his presence on the project and shall not stop nor interfere with the work of any workmen without the permission of the Contractor or his representative.

"C. If the grievance or dispute is not satisfactorily adjusted by the business agent or special representative and the Contractor or his representative within three (3) working days from the date of the occurrence of the grievance or dispute, either party may refer the matter to the Joint Conference Board (as defined and constituted in Article XII of this Agreement). If a Contractor desires to refer a grievance or dispute to the Joint Conference Board, he shall send a written notice to the appropriate chapter of the Associated General Contractors, Las Vegas Builders' Exchange or Southern Nevada Home Builders Association, Inc. depending upon the Contractor's affiliation, and serve copies of said notice on (1) the Secretary of the Building and Construction Trades Council having jurisdiction and (2) the Business Agent of the Union involved in the grievance or dispute or his representative. Said notice shall contain the names of the contractor(s) and Union(s) involved in the grievance or dispute; and a brief statement of the nature of the grievance or dispute.

"If a Union desires to refer a grievance or dispute to the Joint Conference Board the Business Agent or his representative shall notify in the same manner the Secretary of the Building and Construction Trades Council having jurisdiction in the area in which the grievance

arose, and serve copies of said notice upon (1) the Contractor involved or his representative and (2) the appropriate Chapter of the Associated General Contractors, Las Vegas Builders' Exchange or Southern Nevada Home Builders, Inc. depending upon the affiliation of the Contractor. Thereafter, the Chapter Secretary acting for the signatory associations and the Secretary of the Building and Construction Trades Council receiving such notice shall notify their respective chairmen of the Joint Conference Board of receipt of said notice by transmitting a copy to them, and the chairmen shall immediately thereafter agree upon a time and place for a meeting of the Joint Conference Board to consider the matter. Said meeting shall be set not more than seven (7) working days from the date of receipt of said notice by the Chairman.

"D. Before the meeting of the Joint Conference Board the Secretary of the appropriate signatory association, or his representative, and the Secretary of the Building and Construction Trades Council involved, or his representative, may attempt through conciliation and mediation to adjust said grievance. If they succeed in adjusting the grievance or dispute, they shall immediately so notify their respective chairmen of the Joint Conference Board and the scheduled meeting shall be cancelled. In the event, however, that they are unable to adjust satisfactorily the grievance before the date set for the meeting of the Joint Conference Board, the Joint Conference Board shall meet to consider the grievance or dispute referred to it and make its recommendation to the parties. If the Joint Conference Board fails to make a recommendation within three (3) working days after meeting, or if either party disagrees with the recommendation made the grievance or dispute shall be referred to a Joint Arbitration Committee composed of two (2) representatives of the Unions and two (2) representatives of the Contractors. Whenever possible, the Joint Arbitration Committee shall be composed of persons not directly involved in the dispute. The Joint Arbitration Committee shall then hear and review any grievance or dispute submitted to it and adjudicate the

same. The award of the Joint Arbitration Committee shall be final and binding upon all parties to this Agreement when made by a majority of the four (4).

"In the event that a majority vote cannot be secured within three (3) working days after the submission of said grievance or dispute to the Joint Arbitration Committee, the four (4) committeemen shall, within twenty-four (24) hours, select a fifth impartial arbiter and all of the parties hereto agree that the award of the impartial arbiter shall be final and binding upon them.

"If, within twenty-four (24) hours after said committeemen attempt to choose a fifth person to act as an arbiter, they are unable to agree upon such fifth person, the fifth person shall be chosen by immediately requesting the regional office of the Federal Mediation and Conciliation Service to submit the names of five (5) persons qualified to act as arbiters. When said list has been presented, the representatives of the Unions and the representatives of the Contractors on the Joint Arbitration Committee shall each have the choice of rejecting the names of two of these five persons, the remaining or fifth one shall be selected as the arbiter within twenty-four (24) hours after submission of said list, and it shall be mandatory for said arbiter to render a decision within forty-eight (48) hours thereafter, unless an extension of time is mutually agreed to by the parties hereto.

"E. No jurisdictional disputes between the Unions signatory hereto, or on whose behalf this agreement is made, shall be submitted for determination to the Joint Conference Board, the Joint Arbitration Committee or an arbiter but shall be determined in the manner provided in Section E of Article III of this agreement. All disputes or grievances arising out of the interpretation or application of any of the terms or conditions of this Agreement shall be submitted for determination and be determined by the procedures set forth in this Article V, but neither the Joint Conference Board, the Joint Arbitration Committee, nor the arbiter, in determining any grievance or dispute shall have authority to modify, vary, change, add to, or remove any of the terms or conditions of this agreement.

"F. All expenses incurred and approved by the Joint Conference Board or the Joint Arbitration Committee, including the fees and expenses of the impartial arbiter, necessary for the consideration and determination of the grievance or dispute submitted to it, shall be borne by and divided equally between the Unions and the Contractors.

"G. A craft steward shall be a working employee, appointed by the Unions, who shall, in addition to his work as an employee, be permitted to perform during working hours such of his union duties as cannot be performed at other times. The Unions agree that such duties shall be performed as expeditiously as possible and the Contractors agree to allow craft stewards a reasonable amount of time for the performance of such duties. The Unions shall notify the Contractor of the appointment of each Craft Steward and the Contractor before laying off or discharging a Craft Steward, shall notify the union of his intention to do so. It is recognized by the Contractor that it is desirable that the person appointed Craft Steward remain on the job as long as there is work in his particular craft or trade. In no event shall a Contractor discriminate against a Craft Steward or lay him off, or discharge him on account of any action taken by him in the proper performance of his Union duties."

4. Operating Engineers:

"A. In cases of violation, misunderstanding or difference in interpretation of this Agreement by either party, there shall be no cessation or stoppage of work. No dispute, complaint or grievance shall be recognized unless called to the attention of the individual Contractor and the Union within thirty days after the alleged violation occurred. Both parties pledge their immediate cooperation to reach a mutually satisfactory settlement of the above, in accordance with the following procedure.

"B. If the individual employee fails to effect a settlement of his grievance or dispute with the Contractor, or his representative, and the Steward, then the Job Steward, as defined in Article VI, will receive such grievance or dispute from the employee and will report

it to the Business Representative of the Union, who will immediately attempt to adjust same with the Contractor, or his Association representative. In the event such grievance or dispute cannot be satisfactorily adjusted on the job between the representative of the Union and the Contractor, or his representative, within twenty-four hours, then the same may be referred to the Joint Adjustment Board.

"C.   There is hereby established a Joint Adjustment Board, to be composed of three representatives of the Contractors and three representatives of the Union. The Joint Adjustment Board shall have authority to perform the functions set forth in Articles IV and V of this Agreement. Each of the parties shall, within ten days after the execution of this Agreement, appoint its representatives and immediately notify the other party, in writing, of the name and business address of each representative appointed. The Joint Adjustment Board shall thereafter meet within ten days and select its Chairmen and Secretaries and thereafter it shall meet at the call of the Chairmen. The Joint Adjustment Board shall not have authority to make recommendations or decisions which would add to, alter, vary or modify any of the terms or provisions of this Agreement.

"D.   The Joint Adjustment Board shall meet and act upon such matters referred to it, but in no event later than ten working days after referral. A decision shall be rendered within three working days after the Joint Adjustment Board meets. In the event no decision can be reached within three working days, the Joint Adjustment Board may, within two working days, select a seventh person to act as Impartial Chairman by requesting the Federal Mediation and Conciliation Service to furnish the names of five persons qualified to act as Impartial Chairman. When said list has been presented, the representatives of the Contractors and the representatives of the Union comprising the Joint Adjustment Board shall each have the choice of rejecting two names of the five persons listed. The remaining, or fifth person, shall be selected as Chairman and, within twenty-four hours, the Joint Adjustment Board and the

Impartial Chairman shall meet and render a decision within forty-eight hours thereafter. Any and all decisions made by the Joint Adjustment Board and the Impartial Chairman shall be final and binding upon both parties to this Agreement. The time limits specified in this Article, may be altered by mutual agreement.

"E.    In the event the Joint Adjustment Board determines that the Contractor is in violation of the Agreement, wherein wages, hours or working conditions are involved, the employee, or employees, shall be made whole by the Contractor in accordance with the Joint Adjustment Board determination.

"F.    All expenses incurred and approved by the Joint Adjustment Board, including the fees and expenses of the Impartial Chairman, necessary for the consideration and decision of grievances or disputes submitted to it, shall be borne by and divided equally between the Union and the Contractors."

5.    Painters:

"During the term of this Agreement, there shall be a permanent Joint Committee, three (3) representatives from the Association and/or Chapter and three (3) representatives from the Union, with, two (2) alternates from each side. Alternates may attend all meetings, but will not be entitled to vote, except in place of a member for whom he is alternate when said regular member is absent.

"Members or alternate members of the Joint Committee are subject to removal by a majority vote of the members of the respective organization of which he is a representative, at a special meeting called for that purpose. Failure of a particular member or alternate member to attend meetings regularly, may be deemed cause for removal. Delegates and alternates shall be seated upon the presentation of proper credentials from their respective organizations. In the event vacancies occur in the Committee, the Committeeman or Alternate appointed to fill said vacancy or vacancies shall present credentials as herein described for members or alternate members.

"The Joint Committee shall elect a president and vice-president from the Committee and said officers shall be

entitled to voice and vote. All decisions of the said Committee shall be decided by a majority vote.

"The Committee shall be vested with power to adjust disputes and grievances that may arise and shall be empowered to interpret and make such rules and regulations as may be necessary to give force and effect to the intent, purpose and meaning of the Agreement."

6. Electrical Workers:

"There shall be a Joint Conference Committee of three representing the Union and three representing the Employer. It shall meet regularly at such times as it may decide. However, it shall also meet within forty-eight (48) hours when notice is given by either party. It shall select its own chairman and secretary.

"All questions or disputes which are not adjusted between the Union and the Employer shall be referred to this Committee.

"All matters coming before the Committee shall be decided by a majority vote. Four (4) members of the Committee, two (2) from each of the parties hereto, shall be a quorum for the transaction of business, but each party shall have the right to cast the full vote of the membership and it shall be counted as though all were present at the meeting. In a dispute involving a specific shop neither the employer nor any of the employees of said shop, even though they be members of the Committee, are eligible to sit in judgment on that particular case.

"Should this Committee fail to agree or to adjust any matter, such shall then be referred to the 'Council on Industrial Relations for the Electrical Construction Industry.' Its decision shall be final and binding.

"When any matter in dispute has been referred to the Joint Conference Committee or the 'Council on Industrial Relations for the Electrical Construction Industry' for adjustment, the provisions and conditions prevailing prior to the time such matter arose shall not be changed or abrogated until the decision is rendered."

7. Iron Workers:

"Boards of Adjustment shall be created for the settlement of disputes, except jurisdictional disputes, which shall be composed of two representatives selected by the

Union and two representatives selected by the Employers. No member of any Board of Adjustment shall be an aggrieved party to the dispute being considered. Said Board shall organize within three (3) working days and shall elect a Chairman and a Secretary and shall adopt rules of procedure which shall bind the contracting parties. Said Boards shall have the power to adjust any differences that may arise regarding the meaning and enforcement of this contract. Within twenty-four (24) hours of the time any dispute is referred to it by either party, said Board shall meet to consider such dispute. If the Board, within twenty-four (24) hours after such meeting cannot agree on any matter referred to it, the members thereof within three (3) days shall choose a fifth member, who shall have no business or financial connections with either party. The decisions of said Boards shall be determined by a majority of their members and, pending such decisions, work shall be continued in accordance with the provisions of this contract. The expense of employing said fifth person shall be borne equally by both parties. No proceeding hereunder based on any dispute, complaint or grievance herein provided for, shall be recognized unless called to the attention of the individual employer or the Local Union involved in writing within fifteen (15) days after the alleged violation is committed. Copies of the decision of the Boards shall be mailed to the Employers and the Union."

8. Plumbers:

"Any labor dispute or grievance under this Agreement, or any question involving interpretation of this Agreement, shall first be discussed between the shop steward and the employer involved, or his representative. If such labor dispute or grievance cannot be settled by such discussion, the business agent of the Union and the Employer, or his authorized representative, shall attempt to settle the same by direct negotiation, or with the mediation of the Administrator of the Joint Committee; if such labor dispute or grievance cannot be settled by such direct negotiation, or mediation of the Administrators, it may be referred by either party to the Joint Committee, which shall act promptly thereon through investigation, and, if the Committee deems the

same proper, through formal hearing. The decision of the Joint Committee shall be final and binding upon the parties hereto. If the Committee is unable to agree upon a decision within five (5) days after such matter is first submitted to it, the labor dispute, grievance, or question involving interpretation of this Agreement shall be referred to the Board of Arbitration."

9. Teamsters:

"A. That the Union steward, as defined in Section G of this Article, is to receive grievances or disputes from employees working in classifications of his craft, and shall immediately report them to his business agent or special representative who shall immediately attempt to adjust said grievance or dispute with the Contractor or his representative.

"B. Such business agent or special representative shall have access to the project during working hours for the purpose of adjusting grievances or disputes and shall make every reasonable effort to advise the Contractor or his representative of his presence on the project, and shall not stop nor interfere with the work of any workman without the permission of the Contractor or his representative.

"C. If the grievance or dispute is not satisfactorily adjusted by the business agent or special representative and the Contractor or his representative within three (3) working days from the date of the occurrence of the grievance or dispute, either party may refer the matter to the Joint Conference Board (as defined and constituted in Article XII of this Agreement). If a Contractor desires to refer a grievance or dispute to the Joint Conference Board, he shall send a written notice to the appropriate chapter of the Associated General Contractors of America, Inc., to the Las Vegas Builders' Exchange or Southern Nevada Home Builders Association, Inc., depending upon the Contractor's affiliation and serve a copy of such notice on the Secretary-Treasurer of Teamsters Local No. 631, Las Vegas, Nevada. Said notice shall contain the name of the contractor involved in the grievance or dispute; and a brief statement of the nature of the grievance or dispute.

"If the Union desires to refer a grievance or dispute to the Joint Conference Board, the Business Agent or his representative shall serve written notice upon (1) the Contractor involved or his representative and (2) the appropriate chapter of the Associated General Contractors of America, Inc., Las Vegas Builders' Exchange, or Southern Nevada Home Builders Association, Inc., depending upon the affiliation of the Contractor. Such notice shall likewise contain the name of the Contractor involved and a brief statement of the nature of the grievance or dispute.

"Upon receipt of notice that a contractor or the Union desires to refer a dispute to the Joint Conference Board, the Manager of the Associations and the Secretary-Treasurer of the Union shall agree upon a time and place for a meeting of the Joint Conference Board to consider the matter. Said meeting shall be set not more than three (3) working days from the day of receipt of such notice of appeal to the Joint Conference Board.

"D.   If a majority decision is reached by the Joint Conference Board, that decision shall be final and binding upon the parties to the dispute. In the event that a majority vote cannot be secured within twenty-four (24) hours by the Joint Conference Board, a deadlock shall be declared after which either the Association or the Union may refer the matter in dispute to an impartial arbiter in accordance with the following procedure:

"The party electing to arbitrate shall notify the other in writing of its desire to do so. Upon receipt of such notice the manager of the Association and the Secretary-Treasurer of the Union (or their designated representatives) shall attempt to select an impartial arbiter acceptable to both.

"If, within twenty-four (24) hours of receipt of the notice to arbitrate said representatives are unable to agree upon the impartial arbiter they shall jointly petition the Federal Mediation and Conciliation Service to submit a panel of five (5) names of persons qualified to act as the impartial arbiter. Upon receipt of said panel of names, the representative of the Union and the representative of the Association shall each alternately strike

a name until four of the five names submitted have been eliminated. The fifth or remaining nominee shall be the impartial arbiter.

"The arbitration hearing shall be scheduled as soon as possible thereafter and the arbiter shall be required to issue his decision within forty-eight (48) hours of the close of the hearing unless the parties mutually agree, in writing, to an extension of time.

"E.   All disputes or grievances arising out of the interpretation or application of the terms or conditions of this Agreement shall be submitted for determination and be determined by the procedures set forth in this Article V. The decision of the impartial arbiter shall be final and binding upon the parties hereto but it is expressly understood that neither the Joint Conference Board nor the Arbiter in determining any grievance or dispute has authority to modify, vary, change, add to, subtract from, or remove any of the terms or conditions of this Agreement."

## APPENDIX B
### TRAVEL TIME PAY PROVISIONS
#### (Campsite to Jobsite and Return)

1.   Carpenters:

"Employees at campsite shall receive travel allowance at the rate of pay applicable to the day on which an employee is employed. Travel shall be from campsite to job to campsite with safe and suitable transportation furnished by the Contractor in compliance with Nevada State Laws. (It is understood that all work performed in excess of eight (8) hours shall be paid at the overtime rate.)"

2.   Sheet Metal Workers:

"If adequate living quarters are not provided at the job site in addition to the subsistence, the employee shall receive travel time and mileage as provided herein from the nearest place that living quarters are available."

3.   Laborers:

"Employees at campsite shall receive travel allowance at straight time rate from the campsite to jobsite and back to campsite with safe and suitable transportation

furnished by the contractor in compliance with Nevada State Laws."

4. Operating Engineers:

"Employees at campsite shall receive travel allowance at straight time rate from the campsite to jobsite and back to campsite with safe and suitable transportation furnished by the Contractor in compliance with Nevada State Laws."

5. Painters: No specific provision.

6. Electrical Workers:

"Where a shop is located on the job site outside the city limits of Las Vegas the travel time will be computed from the city limits of Las Vegas as follows:

"Per mile for the first five (5) actual road miles:

"Twenty-four (24) cents per mile one way for travel time if the Employer furnishes transportation, and an additional

"Twenty (20) cents per mile one way for travel expense, if the employee furnishes his own transportation.

"Per mile for actual road miles thereafter:

"Eighteen (18) cents per mile one way for travel time if the Employer furnishes transportation, and an additional

"Twenty (20) cents per mile one way for travel expense if the employee furnishes his own transportation.

"Vehicle used for transporting men must be covered with adequate seats, and shall observe established speed limits. When the traveling expense to the job equals the amount of eight dollars ($8.00) per day per man then the job will be considered as a subsistence job and the Employer may elect to pay subsistence in cash or negotiable voucher at the rate of eight dollars ($8.00) per day worked, minimum, in lieu of traveling time and transportation or mileage. On remote camp or subsistence jobs suitable accommodations will be provided.

"If on a regularly scheduled work day an employee is not permitted to work due to weather conditions or lack of material, or other causes beyond the employees' control, said employee shall notwithstanding be paid subsistence for such days. If, on non-schedule days (such

as Saturdays, Sundays and holidays) an employee remains away from home over night, said employee shall be paid the regular subsistence for such days.

"Travel time will be paid on subsistence jobs for reporting to, upon employment, and leaving upon termination. Mileage will be paid at ten cents (10¢) per mile, if transportation is not furnished by the Employer.

"Travel time outside of the regular working hours beyond paved roadways, property lines, boundaries or fences shall be paid for at the straight time rate of pay."

7. Iron Workers:

"When an individual employer hires workmen for a job more than 35 miles away from the City Hall in those cities listed in Paragraph (a), the workmen shall be paid travel time, transportation and subsistence, in accordance with the Agreement, whether or not the job is located within another expense-free zone as provided by this Agreement. The individual employer shall pay bridge, ferry and toll road fares.

"Workmen shall receive nine cents (9¢) per mile for transportation to and from jobs over 35 miles from the designated basing point at the beginning and completion of the job.

"Time paid for traveling will be paid for at the straight time hourly rate and will be computed at the rate of 35 miles per hour. Travel time pay shall be computed as follows:

"Determine travel time by dividing 35 into the actual miles over the most direct regularly traveled route between the job and the designated point. Determine travel time pay by multiplying travel time, including fractions, by the straight time rate; provided, however, in no case shall travel time pay exceed 8 hours pay in any 24 hour period."

8. Plumbers:

"On any work performed outside the city limits of Las Vegas and North Las Vegas, the employer shall allow travel expense to and from the job, based on the straight time journeyman hourly wage rate, as agreed between the Employer and the Union.

"On any job so located that it would be impracticable

to travel forth and back to the city limits of Las Vegas, the employer shall provide suitable board and lodging, or forty dollars ($40.00) per week subsistence, or eight dollars ($8.00) per day if the job is of less than five (5) days' duration; or if more than five (5) days are worked per week, eight dollars ($8.) per day. In the event suitable board and lodging can be obtained for less than the subsistence per week, the employee shall receive the difference."

9.  Teamsters:

"Employees at campsite shall receive travel allowance at straight time rate from the campsite to jobsite and back to campsite with safe and suitable transportation furnished by the contractor in compliance with Nevada State Laws."