454 F.2d 1324
 79 L.R.R.M. (BNA) 2555, 67 Lab.Cas. P 12,395
 ASSOCIATED GENERAL CONTRACTORS OF ILLINOIS, an Incorporated
Association, Individually and on Behalf of its
Members, Plaintiff-Appellee,
v.
ILLINOIS CONFERENCE OF TEAMSTERS, an Unincorporated
Association, Individually and on Behalf of its
Members, Defendant-Appellant.
 No. 18729.
 United States Court of Appeals,
Seventh Circuit.
 Jan. 31, 1972.
 
 Gerry M. Miller, Milwaukee, Wis., Goldberg, Previant & Uelmen, Milwaukee, Wis., Clyde E. Craig, Wiley, Craig, Armbruster & Wilburn, St. Louis, Mo., for defendant-appellant.
 John C. Tucker, Chicago, Ill., Edward F. Casey, Springfield, Ill., Edward H. Hatton, Robert L. Bombaugh, Michael P. Seng, Jenner & Block, Chicago, Ill., Casey & Casey, Springfield, Ill., for plaintiff-appellee.
 Before FAIRCHILD, CUMMINGS and STEVENS, Circuit Judges.
 STEVENS, Circuit Judge.
 
 
 1
 The district court enjoined a strike in order to preserve its own jurisdiction to resolve an underlying dispute between parties to a collective bargaining agreement. To decide whether the district court followed a permissible procedure, we need not reach the merits of the underlying dispute. Nevertheless, an understanding of the nature of that dispute is relevant.
 
 I.
 
 2
 The parties have bargained on a multi-employer, multi-union basis for many years. Plaintiff is an association composed of numerous contractors engaged in the building and construction industry, and defendant's membership comprises various local unions. Effective as of April 1, 1970, one three-year agreement was succeeded by another. The transition gave rise to a relatively narrow dispute which mushroomed into this litigation.
 
 
 3
 The underlying dispute is over the wage scale applicable to certain work performed during the three-month period between April 1, 1970, and July 1, 1970, in connection with highway construction contracts which had been previously negotiated. Plaintiff contends that the wage rates are governed by Article XXIII, section 2, paragraph (c), of the 1967-70 agreement.[1] The union contends that the elimination of that paragraph in the 1970-73 agreement was specifically intended to make all wage increases effective as of April 1, 1970. Plaintiff relies primarily on the language of the two written instruments; defendant stresses the intent of the parties as evidenced by their negotiations.
 
 
 4
 The negotiations were initiated by a union letter written in September, 1969, advising that its proposals for a new contract would be submitted shortly. Among the union's proposed changes was a demand that paragraph (c) of Article XXIII be eliminated and that all negotiated wage increases should become effective on April 1, 1970.[2]
 
 
 5
 The negotiating teams agreed upon the substantial terms of the new contract on about May 7, 1970; after ratification by the union membership, the agreement was executed on May 27, 1970. Article IV described the new wage schedule effective on April 1, 1970, and paragraph (c) of Article XXIII relating to work already under contract was omitted, as the union had requested. Apparently construing the new agreement as covering work in progress on April 1, 1970, the union immediately requested that the new wage rates be paid on all such work, the employers took the position that the contract change related only to the transition that would occur three years in the future, and that the old contract still governed the work in question.
 
 
 6
 When the dispute arose on May 27, 1970, it related to some work that had already been performed (i. e., since April 1, 1970) and to some that was not yet completed. Some contractors paid the new rates, but others did not. The union therefore initiated a number of grievances against the contractors who refused to put the new rates into effect prior to July 1 or to make any retroactive payment for work performed since April 1, 1970. On July 2, 1970, at a meeting of the joint grievance committee, a union motion to allow the claims and an association motion to submit the cases to arbitration both failed by a tie vote. The parties were deadlocked.
 
 
 7
 The grievance procedures contained in the 1967-70 and 1970-73 contracts were identical. Neither contract provides for compulsory arbitration. The parties covered the deadlock contingency by the following provision:
 
 
 8
 "Deadlocked cases shall be submitted to arbitration if a majority of the Joint Committee determine to submit such matter to an arbitrator for decision. Otherwise, either party shall be permitted all economic recourse."
 
 
 9
 Following the deadlock, the union proceeded in accordance with this provision. On July 2, 1970, it either struck, or threatened to strike, the contractors who were parties to the deadlocked grievances. No strike activity was initiated before the grievance procedure had been exhausted or against any contractor not a party to a grievance.
 
 
 10
 On July 9, 1970, plaintiff invoked the district court's jurisdiction under Sec. 301 of the Labor-Management Relations Act.[3] At that time the dispute related to a liquidated amount that either was or was not payable on account of work that had been completed. The complaint prayed for a declaratory judgment determining that the rates specified in the expired contract were applicable. It was alleged that the seasonal nature of the construction business would make it economically impossible for plaintiff's members to withstand a strike, and, therefore, unless enjoined, defendant would coerce plaintiff's members both into releasing their right to invoke the court's jurisdiction and into acceding to the union's improper demands. To avoid the risk that the strike would therefore divest the court of its Sec. 301 jurisdiction, and to protect the plaintiff's members from irreparable injury, a motion for a temporary restraining order was filed. The court granted the motion and, after an evidentiary hearing, entered a preliminary injunction.
 
 
 11
 The union appeals pursuant to 28 U. S.C. Sec. 1292(a) (1),[4] contending that the district court disregarded the plain meaning of Sec. 4 of the Norris-LaGuardia Act[5] and the teaching of Boys Markets, Inc. v. Retail Clerks Union, Local 770, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199. Plaintiff responds by arguing that the controversy is not a "labor dispute" within the statute because it concerned completed rather than on-going work, and that Boys Markets authorizes courts to analyze labor controversies on a "case by case" basis in order to resolve disputes by means more orderly than economic warfare.
 
 II.
 
 12
 Unquestionably, on May 27, 1970, when the controversy arose, it was a "labor dispute" as defined by the Act.[6] It concerned terms of employment and its subject matter was arguably encompassed by collective bargaining negotiations which had just been concluded. Whether one agrees or disagrees with the union's views of the merits, the union certainly could properly bargain for an increase in the work in progress wages payable after April 1, 1970, even if they were already covered by the old contract.[7] Thus, at its inception the controversy was a labor dispute.
 
 
 13
 The union's resort to the grievance procedures before initiating any strike activity did not change the character of the dispute or take it outside the language of the statute. It still concerned the terms of employment even though the work had been completed before the grievance proceedings ended in a deadlock. Neither the fact that the union first sought a peaceful solution of the controversy nor the fact that the grievance machinery postponed the union's resort to self-help should cause the defendant to lose the benefit of a statutory provision that otherwise would apply.
 
 
 14
 Not only is the dispute within the language of Norris-LaGuardia, it is also squarely covered by the statute's purpose. That Act " 'was passed primarily because of widespread dissatisfaction with the tendency of judges to enjoin concerted activities in accordance with "doctrines of tort law which made the lawfulness of a strike depend upon judicial views of social and economic policy".' "[8] Federal judges were regarded as allies of management and Norris-LaGuardia was specifically intended to curtail their participation in determining the merits of issues arising between unions and employers. The injunction entered in this case for the purpose of preserving a federal judge's power to decide the merits of the underlying controversy is thus at odds with the history of the Act.
 
 
 15
 This point is highlighted by plaintiff's factual contention that the seasonal nature of its business gave the union such a tactical advantage that the companies needed judicial protection to avoid the consequences of an uneven economic conflict. The court's power to enter an injunction should not turn on its estimate of the probable outcome of a power struggle between disputants. If the union has the right to engage in economic warfare, it must also have the right to decide when it is advantageous to declare war. We cannot lay down one jurisdictional rule for strikes that will probably succeed and another for strikes that may fail, in whole or in part.
 
 
 16
 Plaintiff'; suggestion that exceptions to the statutory prohibition may be developed by judges on a case by case basis is also contradicted by history as well as by the Supreme Court's reasoning in Boys Markets. The Court there noted that Norris-LaGuardia was particularly directed against decrees "drawn on an ad hoc basis without regard to any systematic elaboration of national labor policy." 398 U.S. at 250, 90 S.Ct. at 1592.
 
 
 17
 Boys Markets represents a principled accommodation between Sec. 301 of the Labor-Management Relations Act of 1947 and the "core purpose" of Norris-LaGuardia; the decision rests on a reasoned exposition of the national labor policy. It does not support plaintiff's request for a case-by-case encroachment on the scope of Norris-LaGuardia's prohibition against labor injunctions.
 
 
 18
 The Boys Markets holding is expressly limited to "the situation in which a collective-bargaining contract contains a mandatory grievance adjustment or arbitration procedure." 398 U. S. at 253, 90 S.Ct. at 1594. A finding that the strike is " 'over a grievance which both parties are contractually bound to arbitrate' " is a precondition to an injunctive order. Id. at 254, 90 S.Ct. at 1594. The predicate for the entire opinion is the national labor policy favoring arbitration as " 'the central institution in the administration of collective bargaining contracts.' " Id. at 252, 90 S.Ct. at 1593.[9] Specific enforcement of a union's voluntary agreement to submit disputes to arbitration, like the Railway Labor Act's requirement of compulsory arbitration of certain disputes,[10] results in the peaceful resolution of labor controversies by an impartial tribunal without offending the core purpose of Norris-LaGuardia.[11]
 
 
 19
 *****
 
 
 20
 * * *
 
 
 21
 *****
 
 
 22
 * * *
 
 
 23
 In this case the agreement provides no support for the employers' choice of procedure. The union had not agreed to compulsory arbitration. On the contrary, it had expressly reserved the right to "economic recourse" in the event of a deadlock. It scrupulously exhausted the contract procedures before engaging in self-help. The essential ingredient of the Boys Markets decision-a union's breach of its agreement to arbitrate as the ultimate method of resolving the grievance-is absent here. In view of the critical importance of that aspect of Boys Markets,[12] that case affords plaintiff no support here. The "quid pro quo" which substitutes arbitration-not litigation-for economic warfare is not a part of this contract.[13] The national labor policy, as explained in Boys Markets, does not justify-indeed it prohibits-the entry of the preliminary injunction to prevent the union from asserting a right to strike which it specifically reserved by contract.[14]
 
 
 24
 The preliminary injunction is vacated and the case is remanded for further proceedings consistent herewith.
 
 
 25
 Reversed and remanded.
 
 
 
 [1]
 This so-called "Grandfather Clause" provided:
 "It is agreed that all work contracted for prior to the expiration date of this or any subsequent agreement shall be completed under the wage rates of the old contract. However, no job shall be completed under the terms of the old agreement after one year's time from the date of submission of bids or three (3) months from expiration of the old agreement, whichever is the earlier date."
 
 
 [2]
 The union proposal read as follows: "ARTICLE XXIII "TERMINATION OF AGREEMENT "All dates in this Article to be changed to correspond to a three (3) year Agreement. "SECTION 2. Paragraph C. be deleted. "All negotiated wage increases to become effective April 1, 1970." (DX 2, p. 6) The testimony indicated that the union "stood firm" on this demand throughout the negotiations
 
 
 [3]
 "Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, . . . may be brought in any district court of the United States having jurisdiction of the parties without respect to the amount in controversy or without regard to the citizenship of the parties." 61 Stat. 156, 29 U.S.C. Sec. 185(a)
 
 
 [4]
 It also asserts that appellate jurisdiction is conferred by Sec. 10 of the Norris-LaGuardia Act, 29 U.S.C. Sec. 110
 
 
 [5]
 SEC. 4. "No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute (as these terms are herein defined) from doing, whether singly or in concert, any of the following acts:
 (a) Ceasing or refusing to perform any work or to remain in any relation of employment;
 (b) Becoming or remaining a member of any labor organization or of any employer organization, regardless of any such undertaking or promise as is described in section of this [Act];
 (c) Paying or giving to, or withholding from, any person participating or interested in such labor dispute, any strike or unemployment benefits or insurance, or other moneys or things of value;
 (d) By all lawful means aiding any person participating or interested in any labor dispute who is being proceeded against in, or is prosecuting, any action or suit in any court of the United States or of any State;
 (e) Giving publicity to the existence of, or the facts involved in, any labor dispute, whether by advertising, speaking, patrolling, or by any other method not involving fraud or violence;
 (f) Assembling peaceably to act or to organize to act in promotion of their interests in a labor dispute;
 (g) Advising or notifying any person of an intention to do any of the acts heretofore specified;
 (h) Agreeing with other persons to do or not to do any of the acts heretofore specified; and
 (i) Advising, urging, or otherwise causing or inducing without fraud or violence the acts heretofore specified, regardless of any such undertaking or promise as is described in section of this [Act]."
 
 
 [47]
 Stat. 70-71, 29 U.S.C. Sec. 104
 
 
 [6]
 "(c) The term 'labor dispute' includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee."
 Norris-LaGuardia Act, Sec. 13(c), 47 Stat. 73, 29 U.S.C. Sec. 113(c).
 
 
 [7]
 By its terms, the "Grandfather Clause" applied generally to "future" contracts, which would presumably cover not only the '70-'73 contract, but the '73-'76 and all subsequent contracts as well. The employer's argument would seem to imply that to negate this clause, an express provision so stating would have to be written into the '70-'73 and all future contracts. Such a clause need not be expressly negated if the actions of the parties indicate that they had mutually agreed that it should not apply. We need not squarely decide that question, however, since it goes to the merits of the case
 
 
 [8]
 Boys Markets v. Clerks Union, 398 U.S. at 253, n. 22, 90 S.Ct. at 1593, quoting a Report of the American Bar Association concerning the case overruled by Boys Markets, Sinclair Refining Co. v. Atkinson, 370 U.S. 195, 82 S.Ct. 1328, 8 L.Ed.2d 440 (1962)
 
 
 [9]
 The Court quoted an interpretation of Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972, from Wellington & Albert, Statutory Interpretation and the Political Process: A Comment on Sinclair v. Atkinson, 72 Yale L.J. 1547, 1557 (1963)
 
 
 [10]
 See Brotherhood of Railroad Trainmen v. Chicago River & Ind. Ry. Co., 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622. The court wrote at pp. 40-41, 77 S.Ct. at pp. 640-641:
 "In adopting the Railway Labor Act, Congress endeavored to bring about stable relationships between labor and management in this most important national industry. It found from the experience between 1926 and 1934 that the failure of voluntary machinery to resolve a large number of minor disputes called for a strengthening of the Act to provide an effective agency, in which both sides participated, for the final adjustment of such controversies.
 "The Norris-LaGuardia Act, on the other hand, was designed primarily to protect working men in the exercise of organized, economic power, which is vital to collective bargaining. The Act aimed to correct existing abuses of the injunctive remedy in labor disputes.
 "Congress acted to prevent the injunctions of the federal courts from upsetting the natural interplay of the competing economic forces of labor and capital. Rep. LaGuardia, during the floor debates on the 1932 Act, recognized that the machinery of the Railway Labor Act channeled these economic forces, in matters dealing with railway labor, into special processes intended to compromise them. Such controversies, therefore, are not the same as those in which the injunction strips labor of its primary weapon without substituting any reasonable alternative."
 
 
 [11]
 "We conclude, therefore, that the unavailability of equitable relief in the arbitration context presents a serious impediment to the congressional policy favoring the voluntary establishment of a mechanism for the peaceful resolution of labor disputes, that the core purpose of the Norris-LaGuardia Act is not sacrificed by the limited use of equitable remedies to further this important policy, and consequently that the Norris-LaGuardia Act does not bar the granting of injunctive relief in the circumstances of the instant case
 V.
 "Our holding in the present case is a narrow one. We do not undermine the vitality of the Norris-LaGuardia Act. We deal only with the situation in which a collective-bargaining contract contains a mandatory grievance adjustment or arbitration procedure."
 398 U.S. at 253, 90 S.Ct. at 1593-1594.
 
 
 [12]
 See quotation in note 11, supra. The Court began its opinion also emphasizing the contractual provision for compulsory arbitration:
 "In this case we re-examine the holding of Sinclair Refining Co. v. Atkinson, 370 U.S. 195 [82 S.Ct. 1328, 8 L.Ed.2d 440] (1962), that the antiinjunction provisions of the Norris-LaGuardia Act preclude a federal district court from enjoining a strike in breach of a no-strike obligation under a collective bargaining agreement, even though that agreement contains provisions, enforceable under Sec. 301(a) of the Labor Management Relations Act, 1947, for binding arbitration of the grievance dispute concerning which the strike was called." 398 U.S. at 237-238, 90 S.Ct. at 1585.
 
 
 [13]
 The Court in Boys Markets said:
 "As we have previously indicated, a no-strike obligation, express or implied, is the quid pro quo for an undertaking by the employer to submit grievance disputes to the process of arbitration."
 398 U.S. at 247-248, 90 S.Ct. at 1591. In note 16 of its opinion, the Court cites its decision in Local 174 Teamsters v. Lucas Flour Co., 369 U.S. 95, 105-106, 82 S.Ct. 571, 7 L.Ed.2d 593, where it was held that a no-strike promise might be implied in a compulsory arbitration situation. See also Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 455, 77 S.Ct. 912, 1 L.Ed.2d 972; United Steelworkers v. American Mfg. Co., 363 U.S. 564, 567, 80 S.Ct. 1343, 4 L.Ed.2d 1403; International Union of Operating Engineers, Local 150 v. Flair Builders, Inc., 7 Cir. 1971, 440 F.2d 557, 561 (dissenting opinion). A provision for binding arbitration, which is not present in this case, was of critical importance in the cited cases.
 
 
 [14]
 The contract does contain a no-strike clause which provides that disputes shall be settled under the arbitration procedure. That procedure itself provides for resort to "all economic recourse" in deadlocked situations