The **GENERAL BUILDING CONTRACTORS ASSOCIATION, INC.,** acting for and on Behalf of Turner Construction Company, Plaintiff,

v.

**LOCAL UNIONS 542, 542–A, 542–B, INTERNATIONAL UNION OF OPERATING ENGINEERS** and Robert Walsh, Business Manager, Local Union 542, International Union of Operating Engineers, Defendants.

Civ. A. No. 74–131.

United States District Court, E. D. Pennsylvania.

Jan. 30, 1974.

Ralph B. Powell, Jr., Harvey, Pennington, Herting & Renneisen, Philadelphia, Pa., for plaintiff.

Martin J. Vigderman, Freedman, Borowsky & Lorry, Philadelphia, Pa., for defendants.

## MEMORANDUM AND ORDER

BRODERICK, District Judge.

This matter comes before the Court on the motion of the plaintiff, General Building Contractors Association, Inc., to enjoin the defendants, Local Union 542, 542–A, 542–B, International Union of Operating Engineers and Robert Walsh, Local 542's business manager, from proceeding with a strike or work stoppage at job sites of the Turner Construction Company and to require the defendants to submit the dispute upon

which the strike or work stoppage is based to the grievance and arbitration procedure in accordance with the collective bargaining agreement.

The complaint in this case was filed on January 18, 1974, and a hearing was scheduled and held on January 21, 1974. The parties agreed that no strike or work stoppage would take place pending this Court's determination of the matter.

The plaintiff, General Building Contractors Association, Inc. (Association), is a multi-employer association which acts, *inter alia,* as the duly authorized collective bargaining agent for the Turner Construction Company (Turner). Turner is the general contractor for the construction of a twenty-two story office building for the Oliver Tyrone Corporation at 1234 Market Street in Philadelphia, Pennsylvania, as well as the general contractor for six other projects with a total contract price in excess of $100 million. Operating Engineers from the defendant union are employed at four of these jobs, and a work stoppage would cost Turner approximately $25,000 per week. The defendant, Local 542, 542–A, 542–B, International Union of Operating Engineers (Union) is an unincorporated labor association which is the recognized collective bargaining agent for the Operating Engineers in the eastern half of Pennsylvania and the State of Delaware.

The Association and the Union are parties to a collective bargaining agreement (Agreement) which governs the wages, hours and working conditions of the Operating Engineers at the job sites in question. The parties have stipulated that the Agreement is valid and binding in this litigation.

Article VI of the Agreement provides, in pertinent part:

*Section 2—Non-jurisdictional Disputes and Grievances—All disputes and grievances of any kind or nature whatsoever arising under the terms and conditions of this agreement and all questions involving the interpretation of this agreement shall be referred to a grievance committee con-*

sisting of two (2) members selected by the Employer and two (2) members selected by the Union. Either party shall be entitled to invoke the grievance procedure by calling a meeting within twenty-four (24) hours' notice. *Should the grievance committee be unable to resolve the issue submitted within a period of twenty-four (24) hours after the meeting, the matter shall then be referred to an impartial arbitrator* who shall be selected as follows: Application shall be made to the American Arbitration Association to submit a panel of five (5) arbitrators, from which each side shall alternatively strike two names and the person whose name remains shall be the arbitrator for the dispute. The arbitrator thus selected shall conduct his hearings and proceedings in accordance with the rules of the American Arbitration Association except that he shall be obliged to render his decision within forty-eight (48) hours of the conclusion of his hearings or procedures. The decision of the arbitrator shall be final and binding upon the parties. *There shall be no strikes, work stoppages, slowdowns, or lockouts during the arbitration.* (emphasis added.)

*Section 3—Strikes and Lockouts—It is agreed that there shall be no strikes, work stoppages, or slowdowns of any character whatsoever by the Union or its members and that there shall be no lockouts by the Employer during the term of this agreement,* except as hereinabove defined in Article VII, Sec. 4 (Penalty Clause). *If an employer is in clear violation of the contract and his violation is not corrected on notice from the Business Manager, the Business Manager may call a strike against the violating employer without observing the grievance and arbitration procedure.* (Emphasis added).

The Union contends that it has a right to strike on the ground that the present dispute arises from a "clear violation" by Turner of the provisions of Section 24 of Article IV of the Agreement, which provides:

*Section 24—Outside Power*—When the employer obtains power from a permanent or temporary plant, i. e., steam, compressed air, hydraulic or other power, for the operating of any machine or automatic tools, or for the purpose of furnishing temporary heat for heating material or to buildings under course of construction or used in the construction of new buildings, additions, alterations, or repairs thereto; employees covered hereunder shall man and operate such permanent or temporary plant from which source of power is supplied. In the event that the Employer is unable to arrange this, engineers shall man all valves or other outlets of such source of power as is used by the employer.

Prior to January 17, 1974 Turner employed three Operating Engineers "around-the-clock" as "stand-by" on the primary steam valve of the heat system at the 1234 Market Street project. Turner also employed one Operating Engineer to man the material hoist which transports materials from the ground to the upper level of the project.

On January 15, 1974 Turner received a letter from Richard M. Wendlek, the manager of construction for the Oliver Tyrone Corporation, which stated:

Please be advised that we have inspected and found the mechanical systems satisfactory for acceptance and operation by ownership.

The control and operation of the heating system and other mechanical systems were then turned over to the owners of the building, and the three Operating Engineers were laid off as of midnight on January 16, 1974. The parties have stipulated that the mechanical systems at 1234 Market are complete, but that the building is not complete. It was testified that it will take from three months to a year to complete the partitioning and other work in the building for tenant occupancy.

On January 14, 1974, Anthony Piazza, Turner's job superintendent at the project, consulted with John J. Reith, a labor relations assistant for the Association, concerning the proposed layoff of the three Operating Engineers, anticipating the acceptance of the mechanical systems by the owners. Reith advised Piazza that he should obtain a letter from the owners stating that the systems were complete and accepted prior to laying off the Operating Engineers. On the same day, Piazza met with William Civaglia, a business representative of the Union, and advised him of the anticipated layoff. Later that day, Al Holland, another business representative for the Union, met with Piazza and advised him that the Union interpreted Section 24 of Article IV of the Agreement as requiring Turner to continue to employ Operating Engineers until the building was completed.

On January 15, 1974 Piazza again conferred with Reith and advised him of his conversation with Holland. Reith advised Piazza that as long as the mechanical systems were complete and accepted by the owner, the layoffs were proper. On January 16th, Piazza personally notified the Operating Engineer on "stand-by" on the 8:00 A.M. to 4:00 P.M. shift of the layoff, advising him not to report to work the next day, January 17th. On the same day, Piazza advised the other two engineers by telephone that they were laid off as of midnight January 16th. Late in the afternoon of January 16th, Civaglia called Piazza and advised him that there would be "informational pickets" at 1234 Market Street project on January 17th. Also, on January 16th Reith, in a telephone conversation with Joseph O'Donoghue, the Union's District representative, advised O'Donoghue that the heating system was complete. O'Donoghue disagreed, and inquired as to whether the system had been inspected by the Licenses and Inspections Department of the City of Philadelphia. Reith responded that he was aware of no such requirement but promised to look into the matter. Reith later advised O'Donoghue that there was no requirement for inspection by the City.

On January 17th, Joseph Washkill, the director of labor relations for the Association, advised O'Donoghue that Turner was willing to submit the dispute to grievance and arbitration procedure. O'Donoghue took the position that the grievance and arbitration procedure of the agreement was not applicable to the dispute on the ground that the dispute was a "clear violation" of Section 24 of Article IV of the Agreement. O'Donoghue advised Washkill that the Union would shut down all Turner's jobs.

On January 18th the one remaining Operating Engineer at 1234 Market did not appear for work. On the same day, all of the Operating Engineers (five) employed at another Turner project failed to appear for work.

Section 3 of Article VI of the Agreement heretofore quoted provides that there shall be no strike, work stoppages, or slowdowns of any character whatsoever by the Union or its members except that if the employer is in clear violation of the Agreement and the violation is not corrected on notice a strike may be called without observing the grievance and arbitration procedure. Section 2 of the Agreement heretofore quoted provides that all disputes and grievances of any kind or nature whatsoever arising under the terms and conditions of the Agreement and all questions involving the interpretation of the Agreement shall be referred to the grievance and arbitration procedure outlined in the Agreement. This section of the Agreement also states that there shall be no strikes, work stoppages, slowdowns or lockouts during the arbitration.

The first issue to be determined is whether the conduct of Turner in terminating the services of the three Operating Engineers is a "clear violation" of the Agreement. In Allied Division of

Delaware Contractors Association v. Local Unions 542, 542–A, 542–B, International Unions of Operating Engineers, 351 F.Supp. 568 (D.Del.1973), aff'd, 485 F.2d 678 (3d Cir. 1973) the United States District Court for the District of Delaware, Latchum, J., found that a dispute over a guaranteed forty hour weekly wage provision was not a "clear violation" of the same contract which we are construing in this case. Judge Latchum issued an injunction against a strike and ordered the parties to submit the dispute to arbitration. Judge Latchum defined a "clear violation" as follows:

> one that is quickly and easily understood and is free from obscurity, ambiguity or undue complexity. *Id.* at 571.

■ This Court finds that the conduct of Turner in terminating the services of the three Operating Engineers under the circumstances hereinbefore outlined was not a "clear violation" of the Agreement. Section 24 of Article IV is not clear as to whether Turner was under a duty to continue the services of the three Operating Engineers after the heating system was completed and accepted by the owners. The language of Section 24 of Article IV is susceptible of more than one interpretation. Section 24 is certainly not "free from obscurity, ambiguity or undue complexity." It cannot be said, therefore, that the "employer is in clear violation of the contract" and that a strike may be called as provided in Section 3 of the Agreement.

We will now review the recent federal decisions in order to determine whether the dispute at issue is arbitrable under this Agreement, and if so, whether this Court has the power to order that the dispute be submitted to the grievance and arbitration procedure set forth in the Agreement and to immediately enjoin the strike or work stoppage. In 1962, in Sinclair Refining Co. v. Atkinson, 370 U.S. 195, 82 S.Ct. 1328, 8 L.Ed. 2d 440, our United States Supreme Court held that the anti-injunction provisions of the Norris-LaGuardia Act (29 U.S.C. § 104) precluded a federal district court from enjoining a strike in breach of a no-strike obligation under a collective bargaining agreement, even though the agreement contained provisions for binding arbitration of the dispute. In 1970, in Boys Markets, Inc. v. Retail Clerk's Union, Local 770, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199, our Supreme Court overruled *Sinclair* and held that a federal district court did have the power to enjoin a strike whenever the collective bargaining agreement contained a no-strike obligation and provisions for binding arbitration of the dispute. The Court adopted the following language from Justice Brennan's dissenting opinion in *Sinclair* as the procedure to be followed by a federal district court in determining whether to grant injunctive relief, at p. 254, 90 S. Ct. at p. 1594:

> A District Court entertaining an action under § 301 may not grant injunctive relief against concerted activity unless and until it decides that the case is one in which an injunction would be appropriate despite the Norris-LaGuardia Act. When a strike is sought to be enjoined because it is over a grievance which both parties are contractually bound to arbitrate, the District Court may issue no injunctive order until it first holds that the contract *does* have that effect; and the employer should be ordered to arbitrate, as a condition of his obtaining an injunction against the strike. Beyond this, the District Court must, of course, consider whether issuance of an injunction would be warranted under ordinary principles of equity . . . (emphasis in original.)

■ It is, therefore, clear that we have the power to order that the dispute be submitted to the grievance and arbitration procedures if the dispute concerns a grievance which both parties agreed to arbitrate. We must determine

whether the strike or work stoppage sought to be enjoined concerns a dispute which both parties agreed to arbitrate.

In making the determination as to whether the parties agreed to arbitrate the dispute in question we recognize the existence of a federal policy in favor of arbitration as proclaimed by our Supreme Court in the *Steelworkers Trilogy*,[1] and recently reiterated in Gateway Coal Co. v. United Mine Workers of America, 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974), wherein the Supreme Court said:

> In the *Steelworkers Trilogy*, this Court enunciated the now well-known presumption of arbitrability for labor disputes: 'An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.' United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582–583 [80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409] (1960).

This policy in favor of the grievance procedure was adopted by our Circuit Court in Avco Corp. v. Local 787 U.A. W., 459 F.2d 968 (3d Cir. 1972), wherein Judge Adams said, at p. 973:

> There are strong reasons supporting the federal policy in favor of arbitration. First, arbitrators are more competent than courts to interpret labor contracts and to resolve the problems of labor-management relations. United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). Second, the process of arbi-

tration contributes to the maintenance of labor peace. United Steelworkers of America v. American Mfg. Co., 363 U.S. 564, 568, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960). Third, ordering arbitration is essential in effectuating the parties' contractual intent to settle disputes through arbitration. Fourth, a suit for damages rather than an injunction ordering arbitration 'might not repair the harm done by the strike, and might exacerbate labor-management strife.' Note, Labor Injunctions, Boys Markets, and the Presumption of Arbitrability, 85 Harv.L. Rev. at 638, citing Boys Markets, Inc. v. Retail Clerk's Union, Local 770, 398 U.S. 235, 248, 90 S.Ct. 1583, 26 L.Ed. 2d 199 (1970).

In Affiliated Food Distributors, Inc. v. Local Union 229, 483 F.2d 418 (3d Cir. 1973), the majority opinion of our Circuit Court (Judge Adams dissenting) reiterated the federal policy in favor of arbitration, but stated that the parties are bound to arbitrate only those disputes which under a fair construction of the agreement they 'have bound themselves to arbitrate.

Even if we interpret *Affiliated Food Distributors* as a limitation upon the broad federal policy favoring arbitration (as Judge Adams in his dissent indicates that it is), we nevertheless find that under a fair construction of the Agreement in this case the parties bound themselves to arbitrate the dispute before this Court. Section 2 of Article VI of the Agreement provides that all disputes and grievances of any kind or nature whatsoever arising under the terms and conditions of the Agreement and all questions involving the interpretation of the Agreement shall be referred to a grievance committee and

---

1. United Steelworkers of America v. American Manufacturing Co., 363 U.S. 564, 80 S. Ct. 1343, 4 L.Ed.2d 1403 (1960); United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

then to an impartial arbitrator. There seems to be little doubt that the parties to this Agreement bound each other to arbitrate the dispute at issue in this case, and as heretofore pointed out, in reaching this conclusion it was not even necessary for the Court to rely upon the accepted federal policy in favor of arbitration. Section 2 of Article VI also provides that there shall be no work stoppages or strikes during the arbitration.

The final issue to be determined by this Court is whether an injunction is warranted under the ordinary principles of equity. The principles of equity which must be considered are, as stated by the United States Supreme Court in *Boys Markets, supra,* at 254 of 398 U.S., at 1594 of 90 S.Ct.:

> The District Court must, of course, consider whether issuance of an injunction would be warranted under ordinary principles of equity—whether breaches are occurring and will continue, or have been threatened and will be committed; whether they have caused or will cause irreparable injury to the employer; and whether the employer will suffer more from the denial of an injunction than will the union from its issuance.

We find on the basis of the credible evidence presented by the parties at the hearing in this case that the Union has breached the no-strike clause in the Agreement by threatening or conducting a work stoppage or strike. We further find that Turner will be irreparably injured if a strike occurs since Turner will lose $25,000 per week and that the public likewise will suffer irreparable injury and that the harm suffered by Turner and the public if the injunction is denied outweighs the harm which will be suffered by the Union from the granting of the injunction.

This Memorandum and Order shall constitute the Court's findings of fact and conclusions of law, pursuant to Rule 52(a), Federal Rules of Civil Procedure.